**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MEDLINE INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. |
| MAERSK MEDICAL LIMITED, an | ) | |
| English company; GILTECH LIMITED, a | ) | NOTICE OF REMOVAL |
| Scottish company; and "DOE" | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED

APR 1 9 2002

02C 2805

JUDGE ALESIA

MAGISTRATE JUDGE LEVIN

**NOTICE OF REMOVAL**

TO:     Clerk of the United States District Court for the Northern District of Illinois

Anton R. Valukas, Esq.
Robert L. Byman, Esq.
Matthew G. Borgula, Esq.
JENNER & BLOCK, LLC
One IBM PLAZA
Chicago, Illinois 60611

Defendants, MAERSK MEDICAL LIMITED ("Maersk") and GILTECH LIMITED ("Giltech"), pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, hereby provide notice of removal of this action from the Circuit Court of Cook County, Illinois to this Court. The grounds for removal are as follows:

1.     On March 19, 2002, Giltech was served with a Summons and Complaint filed in the Circuit Court of Cook County, Illinois in an action entitled *Medline Industries, Inc. vs. Maersk Medical Limited; Giltech Limited; and "Doe" Corporation*, Case Number 02 CH 03327. Plaintiff's Complaint is attached hereto as Exhibit A.

2.     On March 20, 2002, Maersk was served with a Summons and Complaint filed in the Circuit Court of Cook County, Illinois in an action entitled *Medline Industries, Inc. vs. Maersk Medical Limited; Giltech Limited; and "Doe" Corporation*, Case Number 02 CH 03327.

3.     This Notice of Removal is brought pursuant to 28 U.S.C. §§ 1441 and 1446. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 on the basis that there is complete diversity of citizenship between the parties and the amount in controversy is alleged to be in excess of $75,000, exclusive of interest and costs.

4.     Giltech was, at the time the Complaint was filed, and is now, a corporation organized and having its principal place of business in Scotland.

5.     Maersk was, at the time the Complaint was filed, and is now, a corporation organized and having its principal place of business in the U.K.

6.     The Complaint alleges that Plaintiff Medline Industries, Inc. ("Plaintiff") was, at the time the Complaint was filed, and is now, an Illinois corporation with its principal place of business in Mundelein, Illinois. (*See* Compl., ¶ 1). Because Giltech and Maersk were, at the time the Complaint was filed, and are now, citizens of foreign countries, there is complete diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332.

7.     Plaintiff's Complaint seeks, *inter alia*, "actual and exemplary damages in an amount to be proved at trial but which [Plaintiff] reasonably estimates will exceed ten million dollars." (*See* Compl., *Prayers for Relief*, ¶ F). Thus, the amount in controversy is in excess of $75,000, exclusive of interest and costs.

8.     This Notice of Removal is timely because it was filed within thirty days of Giltech's and Maersk's receipt of Plaintiff's Summons and Complaint.

9.     All defendants who have been named and served with Complaint and Summons have joined in the removal of this Action to the United States District Court for the Northern District of Illinois, Eastern Division, as is evidenced by the signatures of their counsel.

10.     The underlying Circuit Court action is one for which this Court has original jurisdiction under the provisions of 28 U.S.C. § 1332, and is one that may be removed to this Court by Giltech and Maersk pursuant to the provisions of 28 U.S.C. § 1441, because the matter in controversy is between a citizen of Illinois and citizens of foreign countries and exceeds the sum or value of $75,000.

11.     Giltech and Maersk have given written notice of the filing of this Notice of Removal to all attorneys of record and to the Clerk of the Circuit Court of Cook County, Illinois.

Dated April 18, 2002

Respectfully submitted,
MAERSK MEDICAL LIMITED



By:     _____
        One of Its Attorneys

J. Patrick Herald, Esq.
Erin M. McCloskey, Esq.
BAKER & MCKENZIE
130 E. Randolph Drive
Suite 2500
Chicago, IL 60601
(312) 861-8800
Attorneys for Maersk Medical Limited

Respectfully submitted,
GILTECH LIMITED



By:     _____
        One of Its Attorneys

John J. Arado, Esq.
Joshua L. Smith, Esq.
WILDMAN, HARROLD,
    ALLEN & DIXON
225 West Wacker Drive
Chicago, Illinois 60606-1229
(312) 201-2000
Attorneys for Defendant Giltech Limited

# EXHIBIT A

APR 18 2002 11:47 FR BAKER & MCKENZIE    312 616 7553 TO 92012555    P.02/02

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 1320 - Served By Mail | 1321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| SUMMONS | ALIAS - SUMMONS | (Rev. 9/3/99) CCG 0001 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY _____ DIVISION

(Name all parties)                                   No. 02 CH 03327

Mediline Industries, Inc.,

v.

Maersk Medical Limited, Giltech Limited, and "Doe"

## SUMMONS

To each defendant:  Maersk Medical Limited, Thornhill Road, North Moons Moat
          Redditch, Worcestershire B 98 9NL England
    YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is
hereto attached, or otherwise file your appearance, and pay the required fee, in the office of the Clerk of this Court at
the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room 2302 _____ , Chicago, Illinois 60602

☐ District 2 - Skokie        ☐ District 3 - Rolling Meadows        ☐ District 4 - Maywood
   5600 Old Orchard Rd.          2121 Euclid                          1500 Maybrook Ave.
   Skokie, IL 60077              Rolling Meadows, IL 60008            Maywood, IL 60153

☐ District 5 - Bridgeview     ☐ District 6 - Markham
   10220 S. 76th Ave.            16501 S. Kedzie Pkwy.
   Bridgeview, IL 60455         Markham, IL 60426

You must file within 30 days after service of this summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF
REQUESTED IN THE COMPLAINT.

To the officer:

    This summons must be returned by the officer or other person to whom it was given for service, with
endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall
be returned so endorsed. This summons may not be served later than 30 days after its date.

FEB 22 2002

Atty. No.: 05003                              WITNESS,

Name: Matthew G. Borgula, Jenner & Block, LLC

Atty. for: Plaintiff

Address: One IBM Plaza                                  Clerk of Court

City/State/Zip: Chicago, IL 60611            Date of service:

Telephone: (312) 222-9350                     (To be inserted by officer on copy left with defendant
                                              or other person)

Service by Facsimile Transmission will be accepted at: _____
                                              (Area Code)  (Facsimile Telephone Number)

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

** TOTAL PAGE.02 **

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| SUMMONS | ALIAS - SUMMONS |

(Rev. 9/3/99)  CCG 0001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY _____ DIVISION

(Name all parties)

No. 02 CH 03327

Medline Industries, Inc.,

v.

Maersk Medical Limited, Giltech Limited, and "Doe"

## SUMMONS

To each defendant:  Giltech, Ltd., 12 North Harbour Industrial Estate, Ayr, KA8 8BN

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room 2302 _____ , Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60426

You must file within 30 days after service of this summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

FEB 22 2002

Atty. No.: 05003 _____

Name: Matthew G. Borgula, Jenner & Block, LLC

Atty. for: Plaintiff

Address: One IBM Plaza

City/State/Zip: Chicago, IL 60611

Telephone: (312) 222-9350

WITNESS, _____

DOROTHY BROWN
CLERK OF _____

Clerk of Court

Date of service: _____
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____
                                                        (Area Code)    (Facsimile Telephone Number)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

27/02 '02 12:18 FAX 0141 307 1192     MACROBERTS     ☐002

FEB-20-2002  08:34     JENNER & BLOCK, LLC          312 527 2484    P.02/19

CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CHANCERY DIVISION

| | | |
|---|---|---|
| MEDLINE INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 02 CH |
| | ) | |
| MAERSK MEDICAL LIMITED; GILTECH | ) | Hon. |
| LIMITED; and "DOE" CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**02CH03327**

## COMPLAINT FOR INJUNCTION, DECLARATORY JUDGMENT AND OTHER RELIEF

Medline Industries, Inc. ("Medline") complains against Maersk Medical Limited

("Maersk"), Giltech Limited ("Giltech") and Doe Corporation ("Doe") as follows:

### Introduction

Medline is America's largest privately held manufacturer and distributor of

healthcare supplies and services. Medline offers more than 100,000 products, but none is more

important than its wound care products sold under the trademark ARGLAES®. Ninety

thousand people die every year from infections that develop from wounds. ARGLAES®

wound care products employ proprietary, patented technology for the controlled release of silver

polymers, providing a revolutionary breakthrough which promotes healing, reduces the

incidence and spread of infection, and offers real hope to prevent unnecessary deaths from

infection.

The proprietary technology and the ARGLAES® trademark were developed and

'27/02 '02 12:18 FAX 0141 307 1192     MACROBERTS                                @003

FEB-20-2002  08:35        JENNER & BLOCK, LLC            312 527 0484   P.03/18

are owned by Giltech and licensed on an exclusive worldwide basis to Maersk, which has the right to grant sublicenses. In 1997, Maersk granted the exclusive United States sublicense to Medline – for which Medline paid more than $1,200,000 in license and royalty fees. Since 1997, Medline has made further investments totaling millions of dollars in the promotion and development of ARGLAES® products, increasing the good will in the ARGLAES® name. It came as a complete shock, therefore, when Medline learned that, without notice to Medline, Giltech and Maersk amended their underlying agreements. Medline has been advised that Giltech now asserts that it has the right to – and in fact that it has taken steps to – enter into contractual relationships with another company ("Doe") so that it can market products in the U.S. in competition with Medline's ARGLAES® products.

        But this is not simply an issue of breach of contract. Medline has learned that it may be the victim of a fraud by Giltech and Maersk. Medline was induced to enter into the sublicense agreement and invest millions of dollars in reliance upon representations – made to Medline by both Giltech and by Maersk – that Maersk had exclusive rights and the ability to assign those exclusive rights to Medline. Yet despite those unequivocal representations, Giltech now asserts that Maersk never had those exclusive rights.

        Medline brings this action to obtain a declaration that its sublicense agreements are fully in force and binding upon Maersk and Giltech; to enjoin Giltech and its as yet undisclosed U.S. partner, Doe, from unfairly competing against Medline in violation of Medline's exclusive license; and for actual and exemplary damages resulting from defendants' breaches of contract, fraud, and other torts.

-2-

### Parties, Jurisdiction and Venue

1.      Medline is an Illinois corporation with its principle place of business at One Medline Place, Mundelein, Illinois. Medline is America's largest privately held manufacturer and distributor of healthcare supplies and services. Medline manufactures and distributes more than 100,000 medical products and services, most of which are branded and sold under the Medline name or other Medline trademarks, through a sales force of more than 600 dedicated sales professionals.

2.      Maersk is a corporation organized under the laws of and having its principle place of business in England.  Maersk is a global company specializing in the development, manufacture and marketing of sterile single-use medical devices for hospitals and the health sector. Maersk is a member of the A.P. Moller Group, a global company which employs more than 60,000 people worldwide with offices in more than 100 countries.

3.      Giltech is a corporation organized and having its principle place of business in Scotland. Giltech is engaged in the design, development and manufacture of medical devices which are sold throughout global markets, including the U.S.

4.      Doe is an entity the identity of which is not yet known to Medline.  On information and belief, Giltech has entered into business relationships with Doe which purports to enable Doe to directly but unfairly compete with Medline in contravention of Medline's rights.  As soon as the identity of Doe is made known to Medline through discovery, Medline will amend its complaint to specifically identify Doe.

5.      Jurisdiction is proper within the State of Illinois.  The contractual agreement

-3-

between Medline and Maersk, to which Giltech was a third party beneficiary and third party obligor, specifies that proceedings may be brought either "in the courts of England or the United States of America at the choice of the plaintiff." The parties agreed "not to assert any defense to jurisdiction." In addition to their contractual undertaking, both Maersk and Giltech have on numerous occasions traveled to the United States in connection with the business relationships which are the subject of this complaint. The fraudulent representations which are alleged in this complaint were made via electronic communications directed into the United States and specifically to Illinois. The fraud and other tort causes of actions were directed to and had their impact upon Medline in Illinois.

6.      Venue is proper in this court pursuant to 735 ILCS 5/2-101 and 102.

### The ARGLAES® Products

7.      Each year in the United States, more than 2 million cases of infection arise as a complication after surgery, wound care or other medical treatment. More than 90,000 deaths result from these infections. ARGLAES® products offer an important advance in wound care treatment and hold great promise in preventing unnecessary deaths.

8.      The most common current treatment for the control of infection in wounds is the use of antibiotics; but antibiotics are not an acceptable long term answer because as the use of antibiotics increases, so too do the forms of bacteria which evolve into new strains resistant to those antibiotics. An alternative to antibiotics is the use of compounds derived from silver, such as silver sulfadiazine, which have been shown to be effective in controlling infection. But these traditional treatments are effective only upon application, and the dressings therefore require

-4-

frequent change. ARGLAES® products represent a real breakthrough, as the first and only controlled release product which can deliver the healing and antibacterial benefits of a silver polymer for up to seven days without the need to change the dressing.

### The Giltech/Maersk Relationship

9.     On information and belief, the relationship between Giltech and Maersk is a collaborative one which goes back many years and covers a number of proprietary products. Giltech performs the research and development; Maersk provides the manufacturing facilities and distribution resources to produce and market the product. Giltech grants Maersk worldwide exclusive rights to the product with the right and expectation that Maersk will grant sublicenses for distribution in discrete geographical areas such as the U.S.. Giltech and Maersk followed that model for ARGLAES® products. Giltech granted an exclusive license to Maersk, with the full knowledge and expectation that Maersk in turn would grant a sublicense to a sublicensee for the U.S.

### The Sublicense Agreement

10.    Medline and Maersk entered into a Sublicense Agreement dated December 1, 1997 (the "Sublicense Agreement") a copy of which is attached as Exhibit 1.

11.    The Sublicense Agreement was the subject of lengthy and detailed negotiations involving extensive communications between the parties. The negotiations involved dozens of telephonic, facsimile, courier or mail communications between the two countries.

12.    The Sublicense Agreement is lengthy, but its purpose was concisely articulated by the parties themselves in the preamble: "MEDLINE wishes to obtain the exclusive right to

-5-

market, sell and distribute certain MM LTD [Maersk] products within the territory under the trademark ARGLAES" and "MM LTD [Maersk] is willing to grant MEDLINE such rights."

13.     It was critical to Medline that it have *exclusive, long-term* rights. Medline had never before paid so rich a price – more than a million dollars – for the right to distribute a product. Medline had never before embarked on a product roll-out that would, as would ARGLAES®, require so heavy an investment in sales representative training and promotional expense. To justify its enormous investment, Medline had to have exclusivity for the entire product line and any new products which might evolve from it; and Medline had to have that exclusivity for a substantial period so that it could amortize its costs.

14.     The Sublicense Agreement runs 14 years from the execution date – to December 1, 2111 – and grants Medline the exclusive rights to the ARGLAES® products then contemplated by the parties, "together with any new wound management product." (Sublicense Agreement, p. 2, 15.)

15.     Although the Sublicense Agreement addressed products to be sold under the ARGLAES® name, Medline needed, and the Sublicense Agreement provided, assurance that Medline's exclusivity would not be emasculated by the introduction of any competing product employing controlled release silver polymer for wound care – whether marketed under the ARGLAES® name or some other. Thus Annex A to the sublicense Agreement defines Medline's exclusivity by reference to five broadly described "product formats." And Medline got further assurance of exclusivity through the representation that Maersk had an exclusive supply agreement for the proprietary raw material necessary to manufacture any controlled

-6-

release wound care product (the "Supply Agreement") for those five product formats. Maersk represented that it had an exclusive Supply Agreement and that it had the right to grant a sub-license to that Supply Agreement to Medline. (Sublicense Agreement, p. 2.) Without the proprietary raw material, no competitor could offer a competing product -- whether sold under the ARGLAES® name or some other mark.

16.    Although Medline could have relied simply on Maersk's representations that it had the power to grant Medline the exclusive rights to ARGLAES® products and to the exclusive Supply Agreement, Medline required and received direct assurances from Giltech. The Sublicense Agreement requires Maersk to provide direct assurances from Giltech. In compliance with that requirement, Maersk caused Giltech to provide Medline with a formal opinion letter (the "Opinion Letter") from its legal counsel, MacRoberts Solicitors; the individual solicitor who signed the Opinion Letter on behalf of the MacRoberts firm and Giltech was David Flint, who also serves as a member of Giltech's Board of Directors.

17.    The Opinion Letter, a copy of which is attached as Exhibit 2, represents that the author's law firm "are legal representatives of Giltech Limited" and that the matters contained in the letter are made "on behalf of and as instructed by Giltech to confirm." The letter confirms that "Giltech have granted to Maersk Medical Limited ("MM") an exclusive supply agreement"; that the term of exclusive supply agreement runs well past the December 1, 2111 expiration date of the Sublicense Agreement; that Maersk "may grant sublicenses" to the Supply Agreement; that, in addition, Maersk is "authorized to grant sublicenses in respect of the trademark ARGLAES®"; that the trademark license to Maersk also extends past 2111; and, last

-7-

Case: 1:02-cv-02805 Document #: 1 Filed: 04/18/02 Page 14 of 57 PageID #:14
27/02  '02 12:20 FAX 0141 307 1192        MACROBERTS                              ☒009

FEB-20-2002  28:37        JENNER & BLOCK, LLC              312 527 0484    P.09/19

but not least, that "the rights granted to MM [Maersk] by Giltech in respect of Giltech's rights
and trademark ARGLAES® and in respect of Giltech's patents and know how relative to the
Products in the Field are granted on a worldwide basis."

18.     The Opinion Letter was transmitted to Medline via facsimile and received by
interstate telephone transmission at Medline's offices in Illinois.

19.     Although the Opinion Letter is not specifically addressed to Medline, Medline
states, on information and belief, that Giltech prepared the letter with the full knowledge that
it had been requested by, would be furnished to, and would be relied upon by Medline.

### Medline's Investment in ARGLAES®

20.     Upon the execution of the Sublicense Agreement in December 1997, Medline
paid Maersk $750,000.00 as the initial license fee.  Subsequently, Medline paid an additional
$500,000.00 to Maersk as additional products were approved by the U.S. Food and Drug
Administration for distribution pursuant to Article 12(d) of the Sublicense Agreement. And as
Medline sold products, it paid the contractually agreed royalty fees, which to date have amounted
to approximately $ 200,000.00.

21.     But Medline's investment in ARGLAES® went well beyond these substantial
license and royalty fees.  Medline has invested extraordinary amounts of resources in the
development and promotion of the ARGLAES® products. Indeed, of the more than 100,000
products in Medline's product line, no product has received more attention. Medline, at great
capital expense, acquired an additional group of 50 sales representatives with special expertise
in wound care products to augment and supplement the efforts of its then existing sales force.

-8-

27/02 '02 12:20 FAX 0141 307 1192    MACROBERTS    Ø010

FEB-20-2002  08:38    JENNER & BLOCK, LLC    312 527 8484  P.10/19

Extensive training was undertaken with respect to both the existing and the new sales representatives. Extensive promotional materials were created and prepared. Medline estimates that it has invested millions of dollars in executive time and in the training and education of its sales force specifically directed to promoting ARGLAES® products and promoting good will in the ARGLAES® trademark.

22.    Among the materials developed to promote ARGLAES® products is a professionally produced video which is used by sales representatives making sales calls throughout the United States. The video can also be sent to potential purchasers in videotape or CD-ROM format. The principle of Giltech, Dr. Thomas Gilchrist, provided an interview for the production of the video, and Dr. Gilchrist is featured on the video. On information and belief, when Dr. Gilchrist gave his on camera interview, he was well aware that it was intended for extensive dissemination throughout the United States in order to promote ARGLAES® products.

23.    In 2001, Medline sold and distributed approximately $2.5 million of ARGLAES® products throughout the United States, paying all applicable royalties to Maersk and Giltech. Projected sales for 2002 are twice that amount, approximately $5 million. Future sales are projected to grow at geometric rates.

24.    But ARGLAES® is more important to Medline than is reflected simply in the sales volume of ARGLAES® itself, impressive as those numbers are. Because ARGLAES® is an innovative, exclusive, proprietary product line, ARGLAES® has a symbiotic positive affect on Medline's entire business and product line.

-9-

25.     ARGLAES® products provide entrees to Medline it might not otherwise have. ARGLAES® enhances Medline's reputation in the medical community as an innovator, as a technology oriented vendor. Any loss of any exclusivity of the ARGLAES® products would not simply weaken Medline's sales of those products themselves, but would have an adverse impact across Medline's entire business.

### The Fraud

26.     Medline has recently learned that Maersk and Giltech have, behind Medline's back, purported to renegotiate their own arrangement, seemingly emasculating the rights already granted to Medline. In addition, Medline has learned that the representations made by Giltech and Maersk which induced Medline to enter into the Sublicense Agreement and pay more than 1 million dollars were false when made.

27.     On information and belief, Giltech and Maersk entered into a series of agreements in 1999 and 2000 in which Maersk purported to cede back to Giltech a portion of the exclusive worldwide ARGLAES® rights previously granted by Giltech to Maersk. Giltech now takes the position with Medline that its private, undisclosed, after the fact dealings with Maersk somehow diminish the rights already granted by Giltech through Maersk to Medline in the Sublicense Agreement.

28.     Most significantly, Giltech has now admitted that it made a critical misrepresentation to Medline when it supplied the Opinion Letter in 1997 with the direct and unequivocal representation that it had "granted to Maersk Medical Limited ("MM") an exclusive supply agreement." *The very author of that statement, Giltech's lawyer and director,*

-10-

*David Flint, now asserts that the representation he made is not true.* In May, 2001, Mr. Flint sent an e-mail message to Medline stating "there is no exclusive supply agreement with MM for supply of raw materials. It was intended to have one but it was never signed and no prices were agreed for supply."

### Giltech's Threatened Actions

29.    Giltech has now advised Medline that it intends to supply persons other than Medline with the proprietary products and technology which were the subject of the exclusive Supply Agreement Giltech first represented existed and now claims was merely intended but not signed. Giltech further takes the position that it has the right to license a U.S. distributor to sell products in direct competition with the ARGLAES® products offered by Medline.

30.    If defendants are permitted to compete with Medline, Medline will lose the value of its multimillion dollar investment in ARGLAES®, will lose anticipated future profits, and will continue to suffer great, immediate, and irreparable harm to its business reputation and goodwill. Money damages alone will be inadequate to fully compensate Medline for its losses.

### COUNT I

### DECLARATORY JUDGMENT THAT THE SUBLICENSE AGREEMENT IS VALID AND ENFORCEABLE

31.    Medline repeats and realleges paragraphs 1-30 as though fully set out herein.

32.    Once granted, contractually conferred rights cannot be retracted without the agreement of all parties to the contract. Giltech and Maersk cannot, through their own subsequent, unilateral and undisclosed acts, take back rights granted to Medline under the Sublicense Agreement. Yet defendants apparently propose otherwise.

-11-

Case: 1:02-cv-02805 Document #: 1 Filed: 04/18/02 Page 18 of 57 PageID #:18
27/02  '02 12:21 FAX 0141 307 1192        MACROBERTS                          ☑013

FEB-20-2002  09:39        JENNER  &  BLOCK, LLC                    312 527 0484    P.13/19

33.    An actual controversy exists. Giltech has announced its intention to offer rights
to Doe which are already granted to Medline.

34.    Whether or not an exclusive Supply Agreement was ever signed, Giltech should,
by virtue of its representation to Medline that the Supply Agreement existed, be estopped from
denying the existence of the Supply Agreement or from taking any action inconsistent with the
exclusive rights granted to Medline for the supply of raw material in the U.S. market.

35.    Medline is entitled to a declaration that the Sublicense Agreement is in full force
and effect; that the Supply Agreement and the Sublicense Agreement are valid and binding upon
Maersk and Giltech; that Maersk and Giltech cannot grant sublicenses or supply raw materials
to any party other than Medline for the U.S. market; and that Doe cannot purchase supplies or
market products in contravention of Medline's rights under the Sublicense Agreement.

## COUNT II

### BREACH OF SUBLICENSE AGREEMENT
### AGAINST MAERSK

36.    Medline repeats and realleges the allegations of paragraphs 1-30 as though fully
set out.

37.    The Sublicense Agreement grants Medline the exclusive U.S. license to
ARGLAES® products.

38.    The Sublicense Agreement grants Medline the exclusive supply of the raw material
for ARGLAES® products in the U.S..

39.    Maersk represented to Medline that it held the exclusive worldwide rights to
ARGLAES® and to the worldwide exclusive supply of the raw material for  ARGLAES®

-12-

products.

40.    Maersk represented to Medline that it had the right to grant exclusive sub-licenses to Medline for the U.S. to ARGLAES® and to the supply of the raw material for ARGLAES® products.

41.    Maersk owed a duty of good faith and fair dealing to Medline in the performance of the Sublicense Agreement. Maersk violated that duty when it subsequently purported to reduce the extent of its own rights as to Giltech without notice to Medline.

42.    Medline has fully performed all its obligations under the Sublicense Agreement.

43.    If the Court does not grant the relief requested in Count I of this Complaint or if Giltech is otherwise able to allow Doe or some other entity to offer products in The U.S. in competition with Medline's ARGLAES® products, Maersk will be in breach of its representations of exclusivity and its obligations of good faith and fair dealing under the Sublicense Agreement.

## COUNT III

### FRAUDULENT INDUCEMENT TO ENTER THE SUBLICENSE AGREEMENT AGAINST MAERSK

44.    Medline repeats and realleges paragraphs 1-30 as though fully set out herein.

45.    Maersk represented to Medline that it held the exclusive worldwide rights to ARGLAES® and to the worldwide exclusive supply of the raw material for ARGLAES® products.

46.    Maersk represented to Medline that it had the right to grant exclusive sub-licenses to Medline for the U.S. to ARGLAES® and to the supply of the raw material for ARGLAES®

-13-

Case: 1:02-cv-02805 Document #: 1 Filed: 04/18/02 Page 20 of 57 PageID #:20
27/02 '02 12:21 FAX 0141 307 1192        MACROBERTS                              ⌐015

FEB-20-2002  28:39        JENNER & BLOCK, LLC                    312 527 0484   P.15/19

products.

47.     If, as now claimed by Giltech, Maersk did not have these rights, then Maersk must have known at the time it made its representations to Medline that the representations were false.

48.     Maersk made its representations with the intent to induce Medline to enter into the Sublicense Agreement.

49.     Medline relied on Maersk's representations and without them would not have entered into the Sublicense Agreement, would not have paid more then a million dollars in licence fees under that agreement, and would not have invested millions of dollars in the development of ARGLAES® products.

50.     Maersk's fraudulent misrepresentations have caused, and will continue to cause, great, immediate, and irreparable harm to Medline's business reputation, injury to its goodwill, loss of competitive advantage, and pecuniary damages. Medline has no adequate remedy at law to compensate it for all the damages that have been and will be caused by Maersk's misrepresentations.

## COUNT IV

## FRAUDULENT MISREPRESENTATION AGAINST GILTECH

51.     Medline repeats and realleges paragraphs 1-30 as though fully set out herein.

52.     Giltech provided its Opinion Letter dated November 11, 1997 (Ex. 2) with the full knowledge and intention that the letter would be sent to Medline in Illinois.

53.     The Opinion Letter represents that "Giltech have granted to Maersk Medical

-14-

Case: 1:02-cv-02805 Document #: 1 Filed: 04/18/02 Page 21 of 57 PageID #:21
27/02 '02 12:22 FAX 0141 307 1192          MACROBERTS                          ☑016

FEB-20-2002 08:40          JENNER & BLOCK, LLC                    312 527 0484   P.16/19

Limited ("MM") an exclusive supply agreement" which runs until "31 December 2013" and that
"MM may grant sub-licenses."

54.     Giltech knew that Medline would rely upon those representations.

55.     Medline did rely upon those representations.  In reliance upon Giltech's
assurances, Medline entered into the Sublicense Agreement, paid more than a million dollars of
license fees, and invested millions of dollars toward the promotion, marketing and distribution
of ARGLAES® products.

56.     Giltech knew that its representations were false when made.

57.     Giltech's fraudulent misrepresentations have caused, and will continue to cause,
great, immediate, and irreparable harm to Medline's business reputation, injury to its goodwill,
loss of competitive advantage, and pecuniary damages. Medline has no adequate remedy at law
to compensate it for all the damages that have been and will be caused by Giltech's fraudulent
misrepresentations.

## COUNT V

## TORTIOUS INTERFERENCE WITH CONTRACT
## AGAINST GILTECH

58.     Medline repeats and realleges the allegations of paragraphs 1-30 as though fully
set out herein.

59.     Giltech was aware of the existence of the Sublicense Agreement between Medline
and Maersk.

60.     Giltech subsequently purported to amend its relationship with Maersk without
notice or warning. Medline asserts that the subsequent acts of Giltech and Maersk cannot and

-15-

do not alter the range or scope of the rights granted to Medline in the Sublicense Agreement. But in the alternative, if Medline's rights were diminished as a result of Giltech's undisclosed renegotiation with Maersk, then Giltech will have tortiously interfered with Medline's contractual relationship with Maersk by causing Maersk to breach the Sublicense Agreement.

61.     Giltech's tortious interference with the Maersk/Medline Sublicense Agreement has caused, and will continue to cause, great, immediate, and irreparable harm to Medline's business reputation, injury to its goodwill, loss of competitive advantage, and pecuniary damages. Medline has no adequate remedy at law to compensate it for all the damages that have been and will be caused by Giltech's tortious interference.

## COUNT VI

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE AGAINST MAERSK, GILTECH AND DOE

62.     Medline repeats and realleges the allegations of paragraphs 1-30 as though fully set out herein.

63.     Based on its exclusive license to market and sell the ARGLAES® product in the U.S., Medline had a reasonable expectation of entering into valid business relationships with thousands of customers for the sale of the ARGLAES® product.

53.     Maersk and Giltech know and, upon information and belief, Doe knows that Medline has a reasonable expectation of entering into valid business relationships with thousands of customers for the sale of the ARGLAES® product.

54.     Maersk, Giltech and Doe have purposefully interfered with Medline's legitimate expectancy by injecting a new, unanticipated and illegal competitor into the ARGLAES® market

-16-

which will prevent Medline from ripening valid business relationships.

55.    Defendants' tortious interference with the Maersk/Medline Sublicense Agreement have caused, and will continue to cause, great, immediate, and irreparable harm to Medline's business reputation, injury to its goodwill, loss of competitive advantage, and pecuniary damages. Medline has no adequate remedy at law to compensate it for all the damages that have been and will be caused by Maersk, Giltech, and Doe's tortious interference.

### PRAYERS FOR RELIEF

WHEREFORE, Medline Industries, Inc. prays for entry of judgment in its favor as follows:

A.    For a declaratory judgment that the Sublicense Agreement is valid and is in full force and affect and grants Medline the exclusive right to market, sell and distribute the ARGLAES® product within the U.S. market;

B.    For a declaratory judgment that the Sublicense Agreement is valid and is in full force and affect and grants Medline the exclusive right to the supply of Giltech's proprietary raw material for wound care products within the U.S. market;

C.    For a declaratory judgment that Giltech is estopped from denying that Maersk has an exclusive Supply Agreement for the supply of Giltech's proprietary raw material for wound care products and that Maersk has the right to and has granted a valid sublicense to Medline for the U.S. market;

D.    For a declaratory judgment that Giltech and Maersk have no right to modify the grant of rights to Medline in the Sublicense Agreement and that any subsequent contractual

-17-

27/02 '02 12:22 FAX 0141 307 1192     MACROBERTS                    ☑019

FEB-20-2002  08:41      JENNER & BLOCK, LLC              312 527 2494   P.19/19

arrangements between Giltech and Maersk were void *ab initio* insofar as they purported to affect

Medline's rights;

    E.    Granting injunctive relief enjoining defendants from entering into competition

in the U.S. market for any products for which Medline is entitled to exclusivity under the

Sublicense Agreement;

    F.    Awarding Medline actual and exemplary damages in an amount to be proved at

trial but which Medline reasonably estimates will exceed ten million dollars; and

    G.    Awarding such other and further relief as may be just.

MEDLINE INDUSTRIES, INC

By: _____

One of its Attorneys

Anton R. Valukas, Esq.
Robert L. Byman, Esq.
Matthew G. Borgula, Esq.
JENNER & BLOCK, LLC (#05003)
One IBM PLAZA
Chicago, Illinois 60611
(312) 222-9350

MedlineComplaint.wpd

-18-

TOTAL P.19

0:0013091249   F90  02-02-20-14:35                                  Last page 20

27/02 '02 12:23 FAX 0141 307 1192    MACROBERTS                                    ☑020



DISTRIBUTION AGREEMENT


BETWEEN


MAERSK MEDICAL LIMITED


AND


MEDLINE INDUSTRIES INC.



"ARGLAES"



Dated: 1st December 1997

## INDEX

|  |  | Page |
|---|---|---|
| Preamble | | 1 |
| Article 1. | Date of Execution | 1 |
| Article 2. | Definitions | 1 |
| Article 3. | Grant | 2 |
| Article 4. | Limitations | 4 |
| Article 5. | Product and Package Specifications and Defects | 5 |
| Article 6. | Product Development | 7 |
| Article 7. | Confidentiality | 8 |
| Article 8. | Registration with Food & Drug Administration | 8 |
| Article 9. | Marketing | 9 |
| Article 10. | Stocks/Reports and Records | 9 |
| Article 11. | Purchase Price/Conditions of Delivery | 10 |
| Article 12. | Commission and Contract Fees/Minimum Purchase Levels | 11 |
| Article 13. | Forecasts/Estimates | 13 |
| Article 14. | Trademark, Information/Ownership | 14 |
| Article 15. | Warranties and Trademark Infringements | 14 |
| Article 16. | Term and Termination | 15 |
| Article 17. | Termination for Cause | 16 |
| Article 18. | Rights and Obligations upon Termination | 17 |
| Article 19. | Force Majeure | 18 |
| Article 20. | Assignability | 18 |
| Article 21. | General | 19 |
| Annex A. | Products | 21 |
| Annex B. | Packaging Specification | 23 |
| Annex C. | Base Purchase Price | 24 |
| Annex D. | Product Registrations | 25 |



### DISTRIBUTION AGREEMENT

(hereinafter "Agreement")

BETWEEN

MAERSK MEDICAL LIMITED
Thornhill Road
North Moons Moat
Redditch, Worcestershire B98 9NL.
England

(hereinafter "MM LTD")


AND

MEDLINE INDUSTRIES INC.
One Medline Place
Mundelein
Illinois 60060
United States of America

(hereinafter "MEDLINE")


Preamble:-

MEDLINE wishes to obtain the exclusive right to market, sell and distribute certain MM LTD Products within the Territory under the Trademark 'ARGLAES'.

MM LTD is willing to grant MEDLINE such rights.

Now, therefore, the parties have agreed as follows:

Article 1.   Date of Execution

This Agreement has been executed as of 1st December 1997

Article 2.   Definitions

For the purpose of this Agreement the following definitions shall apply:

MM LTD and MEDLINE shall have the meaning stated in the heading above.

- 1 -

"Products" shall mean any and all Products listed in Annex A, together with any new wound management product sold under the trademark "ARGLAES".

"Date of Execution" shall mean the date stated in Article 1.

"Information" shall mean any and all documentation and data exchanged between the parties under this Agreement.

"Marketing Year" - The first Marketing Year starts on Date of Execution and ends on 31st December 1998. Thereafter each Marketing Year shall be the calendar year.

"Net Sales Value" shall mean gross sales of Products sold by MEDLINE less the total of ordinary and customary trade discounts (including prime vendor rebates), cash and quantity allowances, value of returned goods, not including freight insurance and other transportation costs, excise taxes, other consumption taxes, customs duty and other compulsory payments to governmental authorities.

"Patents" shall mean any and all patents related to Products, owned or licenced to MM LTD in the Territory.

"Purchase Price" shall mean the purchase price not including royalties or commission at which MEDLINE shall buy Products from MM LTD.

"Registration" shall mean receipt of approval to place Product on the market from the Food and Drug Administration Department of the Government of the United States of America.

"Territory" shall mean the United States of America, Bermuda and Puerto Rico. In addition the Territory will be extended to include Canada and Mexico subject to Article 3 (i) of this agreement.

"Trademark" shall mean the word "ARGLAES", registered by Giltech Ltd and licensed exclusively to MM LTD in the Territory including a right to sublicence to third parties.

"Affiliate" shall mean any corporation at least 50% of the stock of which is or becomes, during the term of this Agreement, owned or controlled directly or indirectly by Medline Industries Inc, One Medline Place, Mundelein, Illinois 60060, U.S.A. or Maersk Medical A/S, Engmosen 1, 3540 Lynge, Denmark who are the ultimate holding company of Maersk Medical Limited.

Article 3.   Grant

(a)   MM LTD represents that it holds an exclusive Supply Agreement for the supply to MM LTD of the raw material necessary for the manufacturer by MM LTD of Products and that said Supply Agreement is for the total duration of this Agreement and shall be maintained in full validity. MM LTD hereby grants to MEDLINE and MEDLINE accepts the exclusive right with a right to sub-licence to any Affiliate, to market, sell and distribute in the Territory Products manufactured by MM LTD. Any sub-licence to an Affiliate shall terminate in the event that the sub-licencee ceases to be an Affiliate.

- 2 -

(b) MM LTD hereby represents that it has authority to grant and grants to MEDLINE and MEDLINE accepts an exclusive licence with a right to sub-licence to any Affiliate to use MM LTD's rights under the trade mark agreement held by MM LTD from Giltech Limited for the Products in the Territory. MM LTD has no knowledge of any difficulties regarding the use of the Trademark in the Territory and MM LTD confirms that the owner of the rights in the Trademark shall maintain such Trademark Registration valid for the entire duration of this Agreement, subject to Article 15 (a) of this agreement.

(c) MM LTD will supply Non-Sterile individual sealed unit packs of Product which MEDLINE may include as part of any other product which MEDLINE may supply or market without MM LTD's prior written agreement, but subject to Article 4(e) of this agreement. It is MEDLINE's responsibility to ensure that Non-Sterile Product supplied by MM LTD is sterilized by radiation using a process which conforms with the requirements of ISO 11137 : 1995 'Sterilization of Healthcare Products - Requirements for validation and routine control - Radiation Sterilization' prior to making the Product available to the market.

(d) In exercising its right and meeting its obligations under this Agreement MEDLINE will act as an independent distributor in its own name and for its own account and risk.MEDLINE shall not hold itself out as being the agent of MM LTD or in anyway to commit MM LTD to any obligations.

(e) MEDLINE shall be free to set its own competitive selling prices for the Products in the Territory

(f) MM LTD agrees to provide training for selected MEDLINE employees who will be responsible for training within MEDLINE for up to a maximum of 3 man weeks at the launch of the first Product and for a maximum of 2 man weeks at the launch of each of the four remaining Products.

(g) MM LTD will supply MEDLINE with twenty (20) sets of ARGLAES European literature at the commencement of this agreement and on each occasion that the literature is updated. Due to differences in European and U.S. legislation this documentation is not to be released to the market and is supplied for reference and internal use only.

(h) MM LTD will permit MEDLINE to enter into sub-licence agreements with other companies in the Territory to supply non-sterile product only for inclusion in that company's products, such as procedure packs, for sale in the Territory subject to the following provisions:-

(i) MEDLINE shall have advised MM LTD of the potential sub-licencee's identity and MM LTD shall have confirmed that the proposed sub-licencee is acceptable to MM LTD. Such confirmation not to be unreasonably withheld.

- 3 -

27/02 '02 12:25 FAX 0141 307 1192    MACROBERTS    ☒025



(ii) That prior to the sale/transfer of Product to a sub-licencee, a written sub-licence agreement shall have been entered into between MEDLINE and the sub-licencee, which imposes on the sub-licencee obligations to MEDLINE which are no less than the obligations which MEDLINE have to MM LTD contained in this Agreement.

(iii) Article 16(d) of this Agreement shall be null and void in the event that it is shown that the cause of the withdrawal, retraction or placing on hold are due to actions by a sub-licencee of MEDLINE.

(i)  The Territory as defined in Article 2 of this Agreement shall be extended to include Canada and Mexico on an exclusive basis for 3 (Three) years from the date of this Agreement. At the end of 3 (Three) years, so long as MEDLINE shall have purchased from MM LTD a minimum of S200,000 (Two hundred thousand USD) of Product specifically for Canada and Mexico combined, and, in addition MEDLINE shall have sold that Product in Canada and Mexico combined subject to Article 12(b)(iii), then Canada and Mexico will be added to the Territory on the same basis as the U.S.A.,Bermuda and Puerto Rico. In the event that MEDLINE shall not have complied with the immediately preceeding sentence then at the end of the three year term Canada and Mexico shall be deleted from the Territory and MM LTD shall be free to appoint exclusive distributors in Canada and Mexico on no better terms than MEDLINE receive under this Agreement. In such event, MM LTD shall enforce all such territorial restrictions (subject to local legislation.)

## Article 4   Limitations

(a)  MEDLINE shall obtain Products only from MM LTD. Subject to the provision of Articles 4 (d) and 6 (c) hereunder, and for the duration of this Agreement, MEDLINE will not, and will procure that each of its Affiliates shall not, manufacture, market, distribute or sell in the Territory any controlled release silver bearing woundcare dressings which compete with the Products.

(b)  In particular MEDLINE will not, and will procure that each of its Affiliates shall not, directly or indirectly deal within the Territory as distributor, dealer, commission merchant or commercial agent for a third party manufacturing or selling competing products as defined in para (a) above.

(c)  MEDLINE shall not issue any Trade Literature which includes the Trademark ARGLAES without first obtaining the prior approval of MM LTD before release to the market. MM LTD shall not unreasonably withold such approval.

- 4 -

(d) This agreement shall not prevent MEDLINE from acquiring companies or businesses within the medical product area, however, if such acquired company or business is involved in activities which conflict with or are complimentary to the sale and distribution of silver bearing woundcare products which in MM LTD's reasonable opinion will or may jeopardise this agreement, MM LTD shall have the right to terminate this agreement within six months of becoming aware of the acquisition and MEDLINE shall pay to MM LTD 60% of the annual minima as calculated under Article 12 (b)(i) until the next effective date of election to make this Agreement non-exclusive as defined in Article 16(b). MM LTD's written consent to any such acquisition shall constitute its waiver of rights under this article 4(d) with respect to such acquisition.

(e) MEDLINE shall not alter or amend the standard presentation of the Product or its packaging.

## Article 5    Product & Package Specifications and Defects

(a) MM LTD shall deliver the Product finished, packaged, labelled and either, non-sterile bulk packed, or, sterilised by irradiation or other methods as consistent with the registration dossiers of the Product, strictly in accordance with agreed Product Specification as detailed in Annex A, and Package specifications as detailed in Annex B to this Agreement. MEDLINE shall be identified on the label as exclusive Distributor for the Product in the Territory. Labelling and Artwork shall be agreed prior to the placing of the first order for Product but must include in a prominent manner the Trademark 'ARGLAES'. In the event MEDLINE desires such artwork to be amended in the future, the new Artwork shall be subject to approval by MM LTD and the costs of amendment shall be borne by MEDLINE.

(b) Should there, upon receipt of the Product by MEDLINE, appear quantitative shortcomings or qualitative defects, then MEDLINE shall promptly notify MM LTD and if such shortcomings or defects are confirmed, MM LTD shall, at no cost to MEDLINE, correct such shortcomings or remedy such defects by a replacement of the Product that has been found to be defective and shall pay all costs of shipping and freight and any customs duties thereon.

(c) Should MM LTD fail to supply the Product in the quantities ordered by MEDLINE, according to MEDLINE's projections as specified in article 13 of this Agreement, then, subject to Article 19 of this agreement, the parties hereto will promptly and in good faith negotiate towards a mutually acceptable solution, ensuring that MEDLINE can continue to market the Product without interruption. In addition, in such event, MEDLINE's minimum purchase obligation as defined in article 12(b) will be adjusted on a time basis for any time that MEDLINE is out of stock of Product.

- 5 -



(d) MM LTD agrees to keep MEDLINE and its Affiliates indemnified in respect of all
losses, claims, demands and associated costs brought against or incurred by
MEDLINE or its Affiliates alleging damage to property or death of or injury to
persons caused by negligent acts or omissions on the part of MM LTD.

MM LTD agrees to keep MEDLINE and its Affiliates indemnified in respect of all
losses, claims, demands and associated costs brought against or incurred by
MEDLINE or its Affiliates alleging damage to property or death of or injury to
persons caused by the Products.

MM LTD and MEDLINE acknowledge that either party to this Agreement is
under no circumstances liable for any indirect or consequential loss of the other
party, except to the extent such loss is included in a judgement obtained by a third
party. (This is without prejudice to any specific obligations contained in the
Agreement.)

If a party to this Agreement is being sued by a third party, then the other party to
this Agreement hereby consents to jurisdiction where the third party claim is to be
decided, so that the liability as between the parties to this Agreement can also be
determined in the same jurisdiction.

(e) MEDLINE shall notify MM LTD promptly, within the timescale set in the F.D.A.
regulations, of any claims or suits involving or potentially involving MM LTD
relating to Products supplied by MM LTD

(f) MM LTD will maintain product liability insurance to an amount of $50,000,000
(Fifty million USD) per occurence through its parent company MAERSK
MEDICAL A/S. In addition, within 14 days after the Date of Execution of this
Agreement, MM LTD will furnish MEDLINE with (i) a certificate naming
MEDLINE as an additional insured under such insurance policy and (ii) English
translated copies of such insurance policies. If MEDLINE has a material objection
to the coverage afforded by any such policies, MM LTD and MEDLINE will use
their best efforts to resolve such objection to their mutual satisfaction.

(g) MEDLINE agrees to keep MM LTD indemnified in respect of all losses,
claims, demands and associated costs brought against or incurred by MM LTD
alleging damage to property or death of or injury to persons caused by negligent
acts or omissions on the part of MEDLINE or its customers including any failure
on the part of MEDLINE or its customers to adhere to MM LTD's instructions
as to the correct storage and use of the Products, especially having specific regard
to the hydroscopic nature of the Products in particular the powder product.

(h) MEDLINE agrees to maintain product liability insurance to a level equivalent to at
least $50,000,000 (fifty million USD) per occurence either directly or through an
Affiliate. In addition within 14 days after the Date of Execution of this Agreement
MEDLINE will furnish MM LTD with (i) a certificate naming MM LTD as an
additional insured of such insurance policy and (ii) copies of such insurance
policies.

- 6 -



(i) The amount of product liability insurance referred to in paragraphs (f) and (h) may be changed annually by the mutual agreement of the parties.

(j) MM LTD will notify MEDLINE as soon as possible regarding Product defect or failure which is considered by MM LTD as likely to have a material effect on the sale of Products in the Territory.

(k) MEDLINE further agrees to indemnify MM LTD against any claim arising out of representations or assurances made by MEDLINE about Products which exceed or conflict with those given by MM LTD to MEDLINE with respect to the Products. Representations or assurances made by MEDLINE which MM LTD have approved shall not be subject to this article.

(l) MEDLINE and MM LTD acknowledge that their rights under this article 5 relating to the quality of the Products or their performance capabilities are the totality of their rights and that any statutory or other implied rights will not apply.

## Article 6   Product Development

(a) If MM LTD manufactures any extension to the range of wound management Products Trademarked ARGLAES, as detailed in Annex A, such product may be added in Annex A in accordance with Article 6 (b) at no cost to MEDLINE.

(b) MM LTD will provide to MEDLINE a description of any new wound management products, under Article 6(a), at such stage as capable of valid evaluation, with features, benefits and all information available  On the basis of such information, MEDLINE will state in writing its initial interest in selling the new product within one hundred and twenty (120) days from receipt of such information. If MEDLINE does not state its initial interest within the one hundred and twenty (120) days, or if terms and conditions are not agreed MM LTD shall then be free to offer such new Product to a third party or a MM LTD Affiliate on no better terms than those offered to MEDLINE.

(c) In the event that MEDLINE desires a new controlled release silver bearing woundcare dressing of its invention to be manufactured, MEDLINE shall offer such manufacturing to MM LTD in priority. MM LTD shall have a period of one hundred and twenty (120) days to confirm its willingness to undertake such exclusive manufacturing and to notify its proposed terms and conditions to do so. Subject to MEDLINE's acceptance of such terms and conditions and to the negotiation and execution of a formal manufacturing agreement. MEDLINE shall grant to MM LTD such manufacturing on an exclusive basis.If MM LTD does not state its initial interest and proposed terms and conditions within the delay of one hundred and twenty (120) days or if no formal agreement is entered into, MEDLINE shall then be free to grant the manufacturing to any third party of its choice on no better terms than those offered to MM LTD.

- 7 -

Silver bearing and/or

(d) In the event that MM LTD manufactures a new 'Antimicrobial Woundcare Product' within 7 (seven) years of the Date of Execution of this Agreement, then, MM LTD shall offer such new antimicrobial woundcare product to MEDLINE. MM LTD will provide to MEDLINE a description of such new antimicrobial woundcare product at such stage as capable of valid evaluation, with features benefits and all information available. On the basis of such information, MEDLINE will state in writing its initial interest in selling the new antimicrobial woundcare products within 120 (one hundred and twenty) days from receipt of such information. In the event that MEDLINE decline to market and sell the new antimicrobial woundcare product then MM LTD shall not offer such product to any third party or Affiliate to market and sell in the Territory until after the seventh anniversary of the Date of Execution of this Agreement.

(e) In the event that MM LTD wishes to alter the Product Specification for any legal or regulatory reason then MM LTD shall give MEDLINE not less than 6 months notice of the intended change.

## Article 7    Confidentiality

(a) MM LTD and MEDLINE shall during the term of this Agreement and for a period of three years after the expiration or termination hereof, keep confidential and not disclose, divulge, use or distribute any proprietary information supplied by either party to the other except if it is with the prior written consent of the supplying party, or the information is received from other sources without breach of any confidentiality agreements, or disclosure is necessary in order for the performance of either MM LTD's or MEDLINE'S duties.

(b) On termination or expiration of this agreement MEDLINE and MM LTD agree to return any proprietary information supplied to the other as soon as is practical. Each party shall bear their own costs in returning the proprietary information to the other.

## Article 8.   Registration with the Food and Drug Administration

MM LTD represents that the current Product registration in the Territory is as described in Annex D. MM LTD shall make all its best efforts so that MEDLINE is free and able to effectively market the Products in the Territory.

MM LTD undertakes to act as follows:

(a) In respect of the Products which have not been approved by the Food & Drug Administration at the date of this Agreement to keep MEDLINE informed as to the progress with each application on a quarterly basis.

(b) To copy MEDLINE with the approval to market for each Product as it is received from the Food & Drug Administration.

- 8 -



    (c) To assign exclusively to MEDLINE, for the duration of this agreement, the rights to the approval to market for each Product as it is received from the Food & Drug Administration.

    (d) To permit MEDLINE to undertake Clinical Trials and/or Evaluations the purpose of which are to extend the claims made in the approval to market the Product, subject to prior agreement with MM LTD. MEDLINE agrees that such trial and/or evaluation will be at MEDLINE's cost and to supply MM LTD promptly with copies of all final reports and 510K amendment documents.

## Article 9.  Marketing

    (a) MEDLINE undertakes to use its best endeavours to market the Products in the Territory which includes, but not limited to, advertising in appropriate magazines, participation in appropriate symposia and exhibition promotion activities and sales visits to existing and potential customers of a reasonable frequency.

    (b) Subject to the extent necessary to the provisions in Article 8 hereabove, MEDLINE shall pay for all costs related to the distribution, marketing and sale of the Products in the Territory.

    (c) MEDLINE undertakes to maintain an efficient sales organisation with an updated knowledge of the Products and the markets. In September of each year for the duration of this Agreement MEDLINE will provide MM LTD with details of its annual marketing plan for the next marketing year for each of the Products sold in the Territory Regularly at least twice per year in the Spring and Autumn MEDLINE and MM LTD marketing organisations shall meet to review current activities and to plan future strategies such meeting to alternate between the USA and England.

    (d) MEDLINE undertakes not to actively seek orders for the products outside the TERRITORY and to advise MM LTD promptly in the event of unsolicited enquiries being received from outside the Territory.

    (e) MEDLINE undertake to deal promptly with questions and problems raised by customers relating to the products.

    (f) MEDLINE undertakes to advise customers as to the correct use of the goods and to offer customers warranties no more favourable than those given by MM LTD.

## Article 10.  Stocks/Reports and Records

    (a) MEDLINE shall during the existence of this Agreement be in possession of a minimum of 3 (three) months stock to cover the demand in the Territory taking into consideration the time of delivery stated in Article 11.



(b) MEDLINE shall keep accurate and complete records to enable determination of sales acheived by MEDLINE under this Agreement and the stock level. Not later than 45 (fortyfive) days after the end of each full calendar quarter MEDLINE shall furnish MM LTD with sales reports and stock reports showing for each size of each of the Products in the Territory (a), the sales value and volume acheived during the period in question and (b) the stock level at the end of the period.

## Article 11.   Purchase Prices/Conditions of Delivery

All purchases of Products made by MEDLINE from MM LTD hereunder shall be subject to the following Purchase Price and conditions of delivery:

(a) The Purchase Prices of the Products are C.I.F. Mundelein Illinois or Allentown Pennsylvania. Prices shall be stated and paid in Pounds Sterling (£STG).

(b) (i) The initial Purchase Prices of the Arglaes Film Dressing are set forth in Annex C of this Agreement and will remain in force until the 31st December 1998. Annex C also contains the estimated price ranges for Arglaes Island Dressing and Arglaes Powder Dressing. Firm prices for Arglaes Island Dressing and Arglaes Powder Dressing and the remaining Products will be notified at the time the application to market is approved by the F.D.A. Prices shall be reviewed by MM LTD annually no later than 1st September of each year, to apply for the next marketing year, subject to para 11 (b)(ii) below, such revised prices shall be valid for the entire following year. Any increase to prices under this article shall not exceed twice the U.K. annual rate of inflation as measured by the U.K.Retail Price Index (R.P.I.), taken at June each year.

(ii) MM LTD reserves the right that in the event of increases in material costs in excess of twice the U.K. annual rate of inflation as measured by the U.K. R.P.I. then MEDLINE agree to an immediate increase in prices of 50% (Fifty percent) of the excess above twice the U.K. annual rate of inflation.

(iii) In the event that there is a drop in material prices of more than twice the U.K. annual rate of inflation as measured by the U.K.R.P.I. then MM LTD agree to an immediate reduction on prices of 50% (Fifty percent) of the crop in excess of twice the U.K. annual rate of inflation.

(c) MM LTD confirm that the price charged to MEDLINE for the Product will not be higher than the lowest transfer price given to any other customer or distributor by MM LTD excluding C.I.F. costs.

(d) Title to and Risk in the Products will pass to MEDLINE on delivery of the Product to MEDLINE.

- 10 -



(e) Terms of payment are thirty (30) days from the end of the month in which the goods are invoiced. Payment to be made in Pounds Sterling (£Stg) by transfer to Lloyds Bank PLC, Church Green East, Redditch, Worcestershire - sort code 30-96-97 Account 00497118, no deduction shall be made for the costs of transmission. The invoice shall be issued by MM LTD, when the goods are shipped from MM LTD. In the event of non payment MM LTD reserve the right to withhold further deliveries without prejudice to all other rights available to MM LTD.

(f) MM LTD will endeavour to deliver the initial order from MEDLINE within sixteen (16) weeks of receipt, subject to the prior agreement of all packaging artwork. MM LTD will endeavour to deliver subsequent orders within twelve (12) weeks of receipt of a firm purchase order stating quantities for each size of the Product. MM LTD reserve the right to supply orders in not more than two (2) deliveries. In the event of changes to the artwork, delivery will revert to 16 weeks from the date that the revised artwork is agreed between the parties.

## Article 12   Commission and Contract Fees/Minimum Purchase Levels

(a) MEDLINE shall pay a royalty of 5% to MM LTD of the Net Sales Value of the Product in the Territory at each quarter end i.e. 31/3, 30/6, 30/9 and 31/12 each year. Such payment shall be made within 45 (fortyfive) days of the quarter end in U.S Dollars by transfer to Lloyds Bank PLC, Church Green East, Redditch Worcestershire - sort code 30-96-97, Account 12179512, no deduction shall be made for the costs of transmission.

(b) (i)The minimum value of Product ordered for despatch by MEDLINE in the year after the first Marketing Year will be equal to the value of goods ordered for despatch in the first Marketing Year plus 20%. In each of the Marketing Years following the first Marketing Year, up to and including the fifth Marketing Year, the minimum value of Products ordered for despatch by MEDLINE shall never be less than the value of Products ordered for despatch in the first Marketing Year of this Agreement plus 20% compound per annum. In the sixth Marketing Year the minimum value of Product ordered for despatch shall be equal to the minimum value of Product ordered for despatch in the fifth Marketing Year. In the seventh to fourteenth Marketing Years inclusive the minimum value of Product ordered for despatch shall be equal to the minimum value of Product ordered for despatch in the sixth Marketing Year plus 5% (Five percent) compound per annum.

- 11 -

(ii) MEDLINE agree that the values in 12(b)(i) above shall, during each Marketing Year include either a minimum of 50,000 (Fifty thousand) single units, or, single units to the value of $100,000 (One hundred thousand USD) whichever is the lesser value of each of the five Products listed in Annex A of this Agreement that is covered by an approval to market from the F.D.A. valid for the full marketing year. MEDLINE may at its discretion elect to waive its right to exclusivity of any Product by giving MM LTD not less than 90 days notice to end on the 31st December in any year. The effect of such an election shall be that (i) MEDLINE shall no longer be required to comply with the minimum order levels contained in this article 12(b)(ii) and (ii) MEDLINE shall retain the non-exclusive right to sell such Products in the Territory, and (iii) MM LTD shall be free to appoint additional non-exclusive distributors for the Product in the Territory. In addition on such election MEDLINE accept that all references to the exclusive use of the Trademark ARGLAES shall be changed to non-exclusive use of the Trademark ARGLAES.

(iii) In the event that MEDLINE does not order the minimum value of Product for despatch in any Marketing Year, calculated as in 12(b)(i) and 12(b)(ii)above and Article 3(i), then MM LTD shall invoice MEDLINE at the end of the Marketing Year an amount equal to 60% of the difference between the value of Product ordered for despatch and the minimum value of Product calculated as in Articles 3(i), 12(b)(i) and 12(b)(ii) and MEDLINE shall pay MM LTD the amount of such invoice on the same basis as invoices raised under Article 11(e).

(iv) In the event that MEDLINE does not have the right to sell, for any reason whatsoever, any of the Products in the Territory on which MEDLINE has paid the fee due under Article 12(d), then the minima as defined in Article 12 (b)(i) shall be reduced in the proportion of the level of sales of the Product which is not available for sale achieved in the previous 6 (Six) months, compared to the sales of all the other Products in the same period.

(c) (i) On signing of this Agreement MEDLINE shall pay MM LTD a contract fee of $750,000 (Seven Hundred and Fifty Thousand U.S.Dollars) for the granting of the licence to use the Trademark ARGLAES on the Film Dressing (Product 1 as listed in Annex A).

(ii) In the event that all five of the Products listed in Annex A of this Agreement are not available for sale in the Territory by 31.12.2001 then MM LTD shall pay MEDLINE the sum of $100,000 (One Hundred Thousand U.S.Dollars) plus interest for each Product which is not available. Interest to be credited from the date of signing of this Agreement.

(d) MEDLINE shall pay a fee of $250,000 (Two Hundred and Fifty Thousand U.S.Dollars) to MM LTD for the granting of the licence to use the Trademark ARGLAES on each of the four Arglaes Products numbered 2 (two) to 5 (five) inclusive as listed in Annex A at the Date of Execution of this agreement. Payment shall be due to MM LTD each time that MM LTD received approval to market one of the Products from the Food and Drug Administration of the U.S.A.

- 12 -



(e) U.K. Government applied taxation as appropriate shall be added to prices shown in this agreement. All U.S. applied taxation is payable by MEDLINE. Payments under article 12 (a) (c) and (d) are payable in full and in the event of a U.S. witholding tax being applied shall be grossed up to give a payment to MM LTD equivalent to the amounts stated.

(f) MM LTD agrees to file an accurate and correct Ownership, Exemption or Reduced Rate Certificate, Internal Revenue Service Form 1001 (or any applicable successor form) with MEDLINE no later than 30 days after the Date of Execution of this Agreement. If any of the information set forth in such Form 1001 becomes innacurate or incorrect in any material respect after delivery thereof to MEDLINE, MM LTD shall file a revised Internal Revenue Service Form 1001 (or any successor form) with MEDLINE no later than 10 days after obtaining actual or constructive knowledge of such inaccuracy. MM LTD agrees to file an accurate and correct Internal Revenue Service Form 1001 (or any applicable successor form) with MEDLINE no later than 10 days prior to the expiration of the Internal Revenue Service Form 1001 (c any applicable successor form) most recently supplied to MEDLINE.

(g) MM LTD hereby represents and warrants that it is not engaged in the conduct of a "trade or business within the United States" for puroses of Section 881(a) of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder, directly or indirectly through and agent. The foregoing representation shall be deemed made by MM LTD in connection with each and every purchase of Product under this Agreement

(h) The third sentence of Article 12(a) shall not apply, and MM LTD shall have no rights thereunder, in the event that MM LTD breaches the covenant under Article 12(f) or any representation under Article 12(g).

(i) If United States witholding tax obligations arise under this Agreement due to a change in the law or a change in the activities or operations of MM LTD, either MM LTD or MEDLINE shall have the right to require renegotiation of the transfer prices of Products.

<u>Article 13. Forecasts/Estimates</u>

MM LTD undertakes to supply MEDLINE all its requirements of Products for the duration of this Agreement and according to the provisions set forth hereinafter.

(a) At the date of finalisation of packaging artwork MEDLINE shall supply MM LTD with a rolling four quarter forecast, the first quarter of which shall be covered by a firm order.

- 13 -



(b) Prior to each quarter end MEDLINE shall place a firm order for the following quarter which shall be within the range of +30% and -10% of the last forecast submitted.

(c) Forecasts shall be based on the number of units of each size of the Product required in each month.

## Article 14.  Trademark, Information/Ownership

(a) MM LTD represents that it has the right to sub-licence the Trademark for at least the intended duration of this Agreement and MM LTD agrees not to sub-licence any other party in the Territory for the duration of this agreement subject to article 16(c).  MEDLINE acknowledges that the Trademark is the exclusive property of Giltech Ltd.

(b) Each party undertakes not to use the Information for any other purpose than for marketing, sale and distribution of Products hereunder and abstain from publishing it, if the Information is designated as confidential.

(c) MEDLINE confirms that its right to use the Trademark is limited to (i) trade literature which has been approved by MM LTD and (ii) any legislative requirement when the Product is included in another product under article 3 (c) of this agreement.

## Article 15  Warranties and Trademark Infringements

(a) MM LTD shall use all reasonable endeavours to maintain to the extent available under local legislation, or cause to be maintained, all Trademark registrations in the Territory. MM LTD has no knowledge of the Trademark being infringed by third parties or infringing the rights of any third party.

(b) MEDLINE shall immediately inform MM LTD of any suit or claim brought against MEDLINE in the Territory by a third party alleging Trademark or Patent infringement by reason of MEDLINE's marketing, sale and distribution hereunder of Products. MEDLINE shall further immediately inform MM LTD, if to MEDLINE's knowledge, any third party is infringing the Trademark or Patents. MEDLINE will co-operate fully with any action, which MM LTD may take to defend the validity of the Trademark or Patent at MM LTD's cost and MM LTD shall save and hold MEDLINE harmless against any such actions and any costs or expenses incurred by MEDLINE as a result thereof.

- 14 -

27/02 ,'02 12:30 FAX 0141 307 1192        MACROBERTS                                      @036



(c) MMLTD hereby represents and warrants to MEDLINE that each of the Patents, Trademarks, and other intellectual property or proprietary rights related to the Products, or the manufacture or design of the Products (collectively, the "Proprietary Rights"), (i) is a valid and enforceable right of the owner thereof (which Medline understands is Giltech Limited), (ii) is sibsisting, and (iii) has not been adjudged invalid or unenforceable, in whole or in part. MM LTD has no knowledge of the current use of the inventions, marks and works to which the Proprietary Rights relate infringing any valid, enforceable or asserted right of any third party. Except for payments to Giltech Limited pursuant to the License Agreement and the Supply Agreement, MM LTD is not required to pay any additional royalty, license fee or similar compensation with respect to any of the Proprietary Rights in connection with the distribution of the Products contemplated by this Agreement. To the best of MMLTD's knowledge, after due and diligent inquiry, no third party is infringing upon any of the Proprietary Rights.

## Article 16  Term and Termination

  (a) This Agreement will become effective upon its execution and, subject only to earlier termination in accordance with other provisions of this Agreement, will continue until the fourteenth anniversary of the Date of Execution.

  (b) MEDLINE shall be entitled to elect to make this Agreement 'Non-Exclusive' by giving MM LTD 90 days written notice to end on either 31st December 2002, 31st December 2004, 31st December 2006 or 31st December 2008. The effect of MEDLINE making an election to make this Agreement 'non-exclusive shall be

  (i) MEDLINE shall no longer be required to comply with the minimum order levels, or shortfall payments contained in Article 12(b).

  (ii) MEDLINE shall have the non-exclusive right to market and sell each of the Products until the 14th anniversary of the Date of Execution of this Agreement.

  (iii) MM LTD shall be free to appoint other distributors on a non-exclusive basis in the Territory on no better terms than contained in this Agreement.

  (iv) MEDLINE accept that all references to the exclusive use of the Trademark ARGLAES shall be changed to non-exclusive use of the Trademark ARGLAES.

  (c) MM LTD shall be entitled to terminate this Agreement if MEDLINE fail to order the minimum value of Product as defined in Articles 12(b)(i) and 12(b)(ii) and, fail to pay the shortfall as defined and Article 12(b)(iii) of this Agreement.

  (d) In the event that MEDLINE does not have the right to sell any of the Products on which MEDLINE has paid the fee due under article 12(d), for whatever reason, for a period of not less than 12 (twelve) consecutive months then MM LTD shall pay to MEDLINE compensation as follows:

- 15 -



(i) If the right to sell was lost within 24 (twenty four) months of the Product being first available for sale in the Territory then MM LTD shall pay MEDLINE $350,000 (Three hundred and fifty thousand USD) for each Product that is not available for sale in the Territory.

(ii) If the right to sell was lost between 24 and 84 months of the Product being first available for sale in the Territory then MM LTD shall pay to MEDLINE $6,000 (Six thousand USD) for each month that each Product is not available for sale in the Territory.

(iii) If the right to sell was lost after 84 months from the Product being first available for sale in the Territory then MM LTD shall not be required to pay MEDLINE any compensation.

## Article 17   Termination for Cause

(a) If either party is in material breach of any of its obligations under this Agreement, the other party may give notice of such breach to the defaulting party and request the latter to remedy the same.  If the party in breach fails to remedy said breach within thirty (30) days after the date of notice or if such breach is not remedied, then this Agreement may be terminated immediately by written notice given by the complaining party to the other.

(b) The Agreement shall be terminable with immediate effect by either party if the other party shall enter into liquidation whether compulsory or voluntary (except for the purpose of amalgamation or reconstruction of a solvent company) or if a manager, receiver, administrator or administrative receiver, or, the equivalent in the United States of America shall be appointed for all or any part of its undertaking or if any distress or execution shall be levied on its goods or any action similar to the foregoing shall be taken by or in respect of it under the laws applicable in any jurisdiction outside the United Kingdom.

(c) Each of the parties may at its own option terminate the agreement in the event that the other party is sold or transferred to an entity not being an Affiliate by giving one months notice in writing to the other not later than 3 months from the date on which the party giving notice becomes aware of the sale or transfer. In the event that MM LTD is sold and MEDLINE elect to terminate the Agreement under this article then MEDLINE shall be entitled to compensation. The amount of compensation shall be $3,000 (Three thousand USD) for each month that the Agreement has remaining  up to the end of the fourteen year term.

## Article 18.   Rights and Obligations upon Termination

In the event of termination, other than expiry, the following will apply without prejudice to any other rights which may be available to either party:-

   (a) In the event that MEDLINE terminate the agreement:-

      (i)MEDLINE shall immediately remit any outstanding monies due to MM LTD and supply MM LTD with detailed customer and marketing information, together with detailed stock schedules.

      (ii) MM LTD shall permit MEDLINE to continue to sell stocks of Product held at the date of termination for a period of 6 (six) months at no less than the average selling price of the previous 6 (six) months. At the end of the six months all rights, including but not limited to, permission to import and sell, rights to acquire and transfer stocks of the product shall pass to MM LTD.

      (iii) MM LTD shall permit MEDLINE to continue to use the Trademark ARGLAES for the six months referred to in article 18(b)(ii) and at the end of the six months shall no longer have the right to use the trademark 'ARGLAES' and shall return all Product and literature bearing the trademark 'ARGLAES' to MM LTD at MEDLINES cost.

      (iv) MEDLINE agrees to pay MM LTD the value of any stocks of pre-printed material held and the cost of cancellation of any orders placed by MM LTD for pre-printed material specifically allocated to the MEDLINE products.

   (b) In the event that MM LTD terminate the agreement,-

      (i)MEDLINE shall immediately remit any outstanding monies due to MM LTD and supply MM LTD with detailed customer and marketing information, together with detailed stock schedules.

      (ii) MM LTD shall permit MEDLINE to continue to sell stocks of Product held at the date of termination for a period of 6 (six) months at no less than the average selling price of the previous 6 (six) months. MM LTD shall buy back all remaining stock of Product at the end of the 6 (six) months at the price MEDLINE paid for the Product.

      (iii) All rights, including but not limited to, permission to import and rights to acquire stocks of the Product shall pass to MM LTD.

      (iv) At the end of the 6 (six) month period after the date of termination MEDLINE shall no longer have the right to use the trademark 'ARGLAES' and shall destroy all literature bearing the trademark 'ARGLAES'.

- 17 -



## Article 19.   Force Majeure

Neither party shall be liable for non-performance of the Agreement due to force majeure
afflicting themselves or their regular suppliers.Force Majeure will have the meaning stated
below under (a):

- (a) Rebellions, mutinies, epidemics, landslides, lightening, earthquakes, fires, storms
floods, sinking, drought, civil disturbances, explosions, acts or decisions of State
or National Governmental Authorities or of Courts of Law, or any other causes
similar or completely different, all beyond the control of the party pleading force
majeure preventing the party from performing its rights and obligations and not to
be overcome by due diligence of such party.

- (b) The parties agree that if either of them find themselves wholly or partly unable to
fulfill their respective obligations in this Agreement by reason of force majeure,
the party pleading force majeure will immediately notify the other party of its
inability to perform giving a detailed explanation of the occurrence which excludes
performance.   If said notice is given, the performance of the notifying party shall
be abated for so long as performance may be prevented by force majeure.   Except
for the payment of funds that are due and payable, neither party shall be required
to make up for any performance that is prevented by force majeure. In such case,
all the obligations of the parties shall be appropriately modified.

- (c) However, if force majeure persists for a time period of more than four (4) months
from the date when the notice in which a party has pleaded force majeure was
sent, the other party will be entitled to terminate this Agreement in accordance
with Article 17 (a),  with no right to compensation or other monies, other than
payment of funds that are due and payable.

## Article 20.   Assignability

- (a) This Agreement and any and all of the rights and obligations of either party
hereunder shall not be assigned, delegated, sold, transferred, sub-licensed or
otherwise disposed of, by operation of law or otherwise, without the prior written
consent of the other party, such consent not to be unreasonably witheld; provided
however, that this consent shall not be required with respect to any assignment,
delegation, sale, transfer, sub-licence, or other disposition by the other party to
any entity controlled by it, controlling or under common control with this party or
an affiliate of the party. In the event that an assignee of either party ceases to be
controlled by its assignor then this agreement shall be reassigned to the assignor.

- (b) Any attempted assignment, delegation, sale, transfer, sub-licence or other
disposition by operation of law or otherwise, of this Agreement or of any rights or
obligations hereunder contrary to this section shall be a material breach of this
Agreement by the attempting party, and shall be void and without force or effect.

- 18 -



Article 21.    General

(a) MEDLINE agrees to observe and conform to all laws, statutes and regulations in
effect in the Territory regarding the distribution, marketing and sale of the
Products.

(b) MM LTD shall deliver Product which complies with the registration dossiers of
the Product and Product Specification as detailed in Annex A of this Agreement.

(c) MEDLINE shall have no authority to make and shall not make or purport to make
any representation, statement or warranty on behalf of MM LTD or otherwise
concerning the Products except as provided for herein and shall use its best efforts
to prevent its employees, agents, officers and authorised subdistributors, if any,
from doing so.

(d) Concurrent with the signing of his Agreement MM LTD will provide MEDLINE
with written legal opinion:-

(i) From the legal representative of Giltech Ltd that the representations made by
MM LTD in Articles 3(a) and 3(b) of this Agreement are correct and that
MM LTD holds agreements with Giltech which convey the rights stated.

(ii) From MM LTD's legal representative that this Agreement is valid and
enforceable under U.K. law.

(e) Any notice required or provided for by the terms of this Agreement shall be sent
registered postage or by telex or facsimile properly addressed with the addresses
first above given or to such other addresses as the parties may at a later date
advise in writing followed by either registered postage if available or by private
courier if not. The effective date of notice shall be the date of receipt of such
notice.

(f) This Agreement constitutes the entire agreement between the parties concerning
the subject matter hereof.  None of the terms of this Agreement shall be amended
or modified except in writing signed by the parties hereto. The headings used in
this Agreement are only meant for easy reading of the Agreement.

(g) The provisions of this Agreement are separate and divisible, and the invalidity or
unenforceability of any part shall not affect the validity or enforceability of any
remaining part or parts, all of which shall remain in full force and effect.
However, the parties agree to substitute invalid or unenforceable provisions by a
valid and enforceable arrangement which achieves to the greatest extent possible
the financial balance and mutual understanding already established between the
parties.

- 19 -

27/02 '02 12:32 FAX 0141 307 1192    MACROBERTS    ☒041



(h) Failure of either party at any time to require performance by the other party of any provisions of this Agreement shall not affect the full right to require such performance at any time thereafter, nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of the provision itself.

(i) In the event of any controversy or claim arising out of or relating to any provision of this Agreement or the breach thereof, the parties shall try to settle the problem amicably between themselves.

This Agreement shall be subject to English Law and proceedings may be brought against either party in the Courts of England or the United States of America at the choice of the plaintiff. *Both parties agree not to assert any defense to jurisdiction.*

This Agreement has been made in duplicate and signed by the parties hereto.

for MAERSK MEDICAL LIMITED
Malcolm Manning

Title: Managing Director

for MEDLINE INDUSTRIES INC.
Andrew Mills

Title: President

- 20 -



## ANNEX A

### PRODUCT SPECIFICATION

PRODUCT

The Product is a controlled release silver bearing woundcare dressing in film, powder or fibre form, or, any of the foregoing in any combination, or in combination with alginate fibre or alginate powder.

The five ARGLAES product formats which are currently planned are:-

1)    ARGLAES FILM DRESSING

2)    ARGLAES ISLAND DRESSING

3)    ARGLAES POWDER DRESSING

4)    ˙ ARGLAES/ALGINATE POWDER DRESSING

5)    ARGLAES/ALGINATE MIXED FIBRE DRESSING


1) ARGLAES FILM DRESSING

(a) Sterilised Product will be supplied pre-cut in individual sealed unit packs, boxed in shelf cartons of 10 units and packed suitable for shipment in quantities shown below.

| Reference | Size | No. in box | Boxes/outer |
|---|---|---|---|
| 2010 | 6cm x 8cm | 10 | 10 |
| 2012 | 10cm x 12cm | 10 | 10 |
| 2025 | 15cm x 25cm | 10 | 5 |

(b) Non-Sterile Product will be supplied pre-cut in individual sealed unit packs, bulk packed in outer cartons packed suitable for shipment in the quantities shown below.

| Reference | Size | No. in box | Boxes/outer |
|---|---|---|---|
| 2010 M | 6cm x 8cm | 500 | (To be confirmed) |
| 2012 M | 10cm x 12cm | 500 | (To be confirmed) |
| 2025 M | 15cm x 25cm | 250 | (To be confirmed) |

- 21 -



## 2) ARGLAES ISLAND DRESSING

All product will be supplied pre-cut and sterilised in individual sealed unit packs, boxed in shelf cartons of 10 units and packed suitable for shipment in quantities shown below.

| Reference | Size | No. in box | Boxes/outer |
|-----------|------|-----------|-------------|
| 2050 | 6cm x 8cm | 10 | 10 |
| 2052 | 10cm x 12cm | 10 | 10 |
| 2055 | 15cm x 25cm | 10 | 5 |

## 3) ARGLAES POWDER DRESSING
## 4) ARGLAES/ALGINATE POWDER DRESSING
## 5) ARGLAES/ALGINATE MIXED FIBRE DRESSING

Product and Packaging specification for the above three Products to be advised at time of submission of the application for approval to market to the Food & Drug Administration for each product.

- 22 -



## ANNEX B

### PACKAGING SPECIFICATION

1) <u>ARGLAES FILM DRESSING</u>
2) <u>ARGLAES ISLAND DRESSING</u>

(a) <u>Sterile Product</u>

All above product is packed in heat sealed foil laminate unit packs, printed on one side with artwork to be agreed.

Each ten units are packaged in white faced card, tamper evident, flip top sealed cartons printed on all sides with artwork to be agreed. Each carton contains one user guide printed in accordance with regulatory and customer requirements.

Shipping cartons of double walled brown corrugated card contain boxed quantities in accordance with the Product specification as detailed in Annex A.

(b) <u>Non-Sterile Product</u>

All above product is packed in heat sealed foil laminate unit packs, printed on one side with artwork to be agreed.

Bulk packed in double polythene bags within double walled brown corrugated card box suitably labelled as requiring further processing.

Shipping cartons of double walled brown corrugated card contain boxed quantities in accordance with the Product specification as detailed in Annex A.

3) <u>ARGLAES POWDER DRESSING</u>
4) <u>ARGLAES/ALGINATE POWDER DRESSING</u>
5) <u>ARGLAES/ALGINATE MIXED FIBRE DRESSING</u>

Packaging specification for the above three Products to be advised at time of submission of the application to market to the Food & Drug Administration for each product.

27/02 '02 12:33 FAX 0141 307 1192          MACROBERTS                                    ☒045



## ANNEX C

### BASE PURCHASE PRICES
(Subject to Article 11(c))

### 1) ARGLAES FILM DRESSING

Initial Prices for Sterile Product
MM LTD will supply MEDLINE with Sterile Products at the prices listed below.

| Reference | Size | Price | Unit |
|-----------|------|-------|------|
| 2010 | 6cm x 8cm | £0.55 | each |
| 2012 | 10cm x 12cm | £0.75 | each |
| 2025 | 15cm x 25cm | £2.03 | each |

The above prices are valid until 31/12/98 and will then be subject to review in accordance with article 11 (b) of the Agreement.

Initial Prices for Non-Sterile Product
Prices for Non-Sterile Product will be confirmed on application for 510K extension.

### 2) ARGLAES ISLAND DRESSING
Initial estimates of prices for sterile product will be in the range shown below.

| Reference | Size | Price Range | Unit |
|-----------|------|-------------|------|
| 2050 | 6cm x 8cm | £1.80/£2.00 | each |
| 2052 | 10cm x 12cm | £2.40/£2.60 | each |
| 2055 | 15cm x 25cm | £5.40/£5.70 | each |

Firm prices will be advised at the time the application to market is approved by the F.D.A.

### 3) ARGLAES POWDER DRESSING
Initial estimates of prices for sterile product will be in the range shown below:

| Reference | Size | Price Range | Unit |
|-----------|------|-------------|------|
| 2030 | 15gm | £4.80/£5.00 | each |

Firm prices will be advised at the time the application to market is approved by the F.D.A.

### 4) ARGLAES/ALGINATE POWDER DRESSING
### 5) ARGLAES/ALGINATE MIXED FIBRE DRESSING

Initial prices for the above two Products to be advised at time the application to market is
approved by the Food & Drug Administration.

- 24 -



## ANNEX D

## PRODUCT REGISTRATIONS

1)      ARGLAES FILM DRESSING

The application to market was received by the Food & Drug Administration on the 14th February 1997 and was allocated the reference K970566. On 4th August 1997 approval to market as 'ARGLAES-AB Antimicrobial Barrier Film Dressing' in line with the 510k submission was received from the F.D.A.

2)      ARGLAES ISLAND DRESSING

The application to market was received by the Food & Drug Administration on the 25th September 1997 and was allocated the reference K973657.


3)      ARGLAES POWDER DRESSING
4)      ARGLAES/ALGINATE POWDER DRESSING
5)      ARGLAES/ALGINATE MIXED FIBRE DRESSING

At the Date of Execution the approval to market has not yet been submitted to the Food & Drug Administration for the above three Products.

- 25 -

'27/02 '02 12:34 FAX 0141 307 1192     MACROBERTS                    ☒047

12-NOV-1997 15:10  FROM  MAERSK MEDICAL    ▲    TO    0018479492280    P.05

## MACROBERTS
### SOLICITORS
GLASGOW  ·  EDINBURGH  ·  LONDON

DF/MM/GI461025
(gk027.brp)

Maersk Medical Limited                                    11th November 1997
Thornhill Road
North Moons Moat
Redditch
WORCS. B98 9NL

**RECEIVED**
**1 2 NOV 1997**

F.A.O. MALCOLM MANNING

Dear Sirs

**Giltech Limited**

We are legal representatives of Giltech Limited, and write on behalf of and as instructed by
Giltech to confirm as follows:-

1.    Giltech have granted to Maersk Medical Limited ("MM") an exclusive supply agreement
      whereby Giltech have agreed to supply only to MM Arglaes calcium phosphate glass and
      silver ("the Products") for use in wound management being management of wounds,
      including but not limited to wounds of the following origins; surgical intervention,
      intravenous puncture, catheterisation, chronic deterioration, acute onset, burns, ostomy
      and accident or emergency ("the Field").

2.    The said exclusive supply agreement will, unless earlier terminated according to its
      terms, or extended, expire on 31 December 2013.

3.    In terms thereof MM may grant sub-licences.

4.    MM are authorised to grant sub-licences in respect of the trademark Arglaes under the
      Trademark Licence granted by Giltech to MM.

5.    In terms of the Trademark Licence, MM are obliged, at their sole expense, to register
      and maintain the trademark Arglaes in the Territory but in Giltech's name. Giltech is
      advised by MM that this has been done but has made no other enquiry in that regard.
      Subject to such maintenance cost being continued to be effected by MM, Giltech shall
      maintain the trademark registration in respect of Arglaes in the Territory.

6.    The Trademark Licence to MM will, unless earlier terminated according to its terms, or
      extended, expire on 31 December 2013.

07/02 '02 12:35 FAX 0141 307 1192    MACROBERTS    @048

12-NOV-1997  15:11   FROM  MAERSK MEDICAL  A      TO     0018479492280   P.06



Maersk Medical Limited                          2          11.11.97

7.   Giltech has not been made aware of any difficulties regarding the use of the trademark in
     the Territory by MM and has not been made aware of the trademark Arglaes having
     been infringed by third parties or infringing the rights of third parties in the Territory.

8.   The rights granted to MM by Giltech in respect of Giltech's rights in the trademark
     Arglaes and in respect of Giltech's patents and know-how relative to the Products in the
     Field are granted on a world-wide basis.

9.   All the Agreements between Giltech and MM are enforceable according to their terms.

Yours faithfully

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua L. Smith, an attorney, state that I caused a copy of the foregoing Notice of Removal to be served on:

> Anton R. Valukas, Esq.
> Robert L. Byman, Esq.
> Matthew G. Borgula, Esq.
> JENNER & BLOCK, LLC
> One IBM PLAZA
> Chicago, Illinois 60611

by First Class United States Mail, postage prepaid, before the hour of 5:00 p.m. on April 18, 2002.

Joshua L. Smith

Civil Cover Sheet

*Cal 2*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet 02C 280 5

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**JUDGE ALESIA**

**Plaintiff(s): MEDLINE INDUSTRIES, INC.**

County of Residence: Lake County, Illinois

Plaintiff's Atty:  Anton R. Valukas
Jenner & Block, LLC
One IBM Plaza, Chicago, Illinois
60611
312-222-9350

**Defendant(s): MAERSK MEDICAL LIMITED, an English company; GILTECH LIMITED, a Scottish company; and "DOE" CORPORATION**

**MAGISTRATE JUDGE LEVIN**

County of Residence:

Defendant's Atty:

See Attached

**DOCKETED**
**APR 1 9 2002**

II. Basis of Jurisdiction:        **4. Diversity (complete item III)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
        Plaintiff:- **1 Citizen of This State**
        Defendant:- **3 Citizen of Foreign Country**

IV. Origin :                **2. Removed From State Court**

V. Nature of Suit:            **190 Other Contract**

VI. Cause of Action:            **28 U.S.C. § 1332, Diversity of Citizenship; declaratory judgment regarding sublicense agreement; breach of contract; fraudulent inducement; tortious interference with contractual relationship and business advantage; fraudulent misrepresentation**

VII. Requested in Complaint
        Class Action: **No**
        Dollar Demand: **$10,000,000**
        Jury Demand: **No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____    *Attorney for Defendant Giltech*

Date: _____ 4/18/02

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser**

## ATTACHMENT OF DEFENDANT'S ATTORNEYS

**MAERSK MEDICAL LIMITED**

J. Patrick Herald, Esq.
Erin M. McCloskey, Esq.
BAKER & MCKENZIE
130 E. Randolph Drive
Suite 2500
Chicago, IL 60601
(312) 861-8800
Attorneys for Maersk Medical Limited

**GILTECH LIMITED**

John J. Arado, Esq.
Joshua L. Smith, Esq.
WILDMAN, HARROLD,
   ALLEN & DIXON
225 West Wacker Drive
Chicago, Illinois 60606-1229
(312) 201-2000
Attorneys for Defendant Giltech Limited

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
Eastern Division

DOCKETED
APR 1 9 2002

In the Matter of

MEDLINE INDUSTRIES, INC., Plaintiff
vs.
MAERSK MEDICAL LIMITED; GILTECH LIMITED; and
"DOE" CORPORATION, Defendants.

Case Number: 02C 2805
JUDGE ALESIA
MAGISTRATE JUDGE LEVIN

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Giltech Limited

| **(A)** | **(B)** |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME John J. Arado | NAME Joshua L. Smith |
| FIRM Wildman Harrold Allen & Dixon | FIRM Wildman Harrold Allen & Dixon |
| STREET ADDRESS 225 W. Wacker DRive | STREET ADDRESS 225 W. Wacker Drive |
| CITY/STATE/ZIP Chicago, Illinois 60606 | CITY/STATE/ZIP Chicago, Illinois 60606 |
| TELEPHONE NUMBER (312) 201-2000 | TELEPHONE NUMBER (312) 201-2000 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 00063266 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06238128 |
| MEMBER OF TRIAL BAR? YES ✔ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ✔ |
| TRIAL ATTORNEY? YES ✔ NO ☐ | TRIAL ATTORNEY? YES ✔ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ✔ |
| **(C)** | **(D)** |
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |