# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James H. Alesia | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2805 | **DATE** | November 14, 2002 |
| **CASE TITLE** | *Medline Industries Inc. vs. Maersk Medical Limited, Giltech Limited, "Doe" Corporation* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court grants in part and denies in part defendant Maersk Medical Limited's motion to dismiss [7-1]. No motions for reconsideration will be entertained. Maersk Medical Limited has 10 days – until December 2, 2002 – to file an answer to any previously unanswered counts of the complaint.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | Document Number |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | NOV 1 5 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | docketing deputy initials | 23 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | 02 NOV 14 PM 4:47 | NOV 1 5 2002 | |
| | | FILED-ED 10 | date mailed notice | |
| CW | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

**NOV 1 5 2002**

| | | |
|---|---|---|
| **MEDLINE INDUSTRIES INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 02 C 2805** |
| | ) | |
| **MAERSK MEDICAL LIMITED,** | ) | **Judge James H. Alesia** |
| **GILTECH LIMITED,** | ) | |
| **"DOE" CORPORATION,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is defendant Maersk Medical Limited's motion to dismiss Counts II, III, and VI of plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). For the following reasons, the court grants in part and denies in part defendant's motion to dismiss.

## I. BACKGROUND

The following facts are taken from plaintiff's complaint, and are assumed to be true for the purposes of defendant Maersk's motion to dismiss. Plaintiff Medline Industries, Inc. ("Medline"), an Illinois corporation, is a manufacturer and distributor of healthcare supplies and services. Defendant Maersk Medical Limited ("Maersk") is an English corporation that develops, manufactures, and markets sterile single-use medical devices. Giltech Limited ("Giltech") is a Scottish corporation that designs, develops, and manufactures medical devices.



The parties' relationship centered on the silver polymer wound care products sold under the trademark ARGLAES. Giltech developed and owns the proprietary technology and the ARGLAES trademark. Giltech licensed the technology and trademark on an exclusive worldwide basis to Maersk, which has the right to grant sub-licenses. On December 1, 1997, Medline and Maersk entered an agreement ("the agreement") in which Maersk granted to Medline "the exclusive right, with a right to sub-license to any Affiliate, to market, sell and distribute in the [United States] [ARGLAES] Products manufactured by [Maersk]."[1] (Pl.'s Compl. Ex. 1 at 2.) In exchange, Medline paid more than $1,200,000 in license and royalty fees. The fourteen-year agreement expires on December 1, 2011.

Three of the provisions of the agreement are currently at issue: (1) the Choice-of-Law Clause, (2) the limitation of liability provision, and (3) Article 3. The Choice-of-Law Clause states, "[t]his agreement shall be subject to English Law and proceedings may be brought against either party in the Courts of England or the United States of America at the choice of the plaintiff. Both parties agree not to assert any defense to jurisdiction." ("Choice-of-Law Clause") (Pl.'s Compl. Ex. 1 at 20.) The limitation of liability provision provides, "either party to this Agreement is under no circumstances liable for any indirect or consequential loss of the other party." ("limitation of liability provision") (Pl.'s Compl. Ex. 1 at 6.) Article 3 of the agreement states, "[Maersk] represents that it holds an exclusive Supply Agreement for the supply to [Maersk] of the raw material necessary for the manufacturer [sic] by [Maersk] of [ARGLAES]

---

[1]The agreement is entitled "Distribution Agreement." The parties disagree as to whether the agreement should be characterized as a "sub-license" or "distribution agreement." The court need not determine the nature of the agreement for purposes of this motion.

Products and that said Supply Agreement is for the total duration of this Agreement and shall be maintained in full validity." ("Article 3") (Pl.'s Compl. Ex. 1 at 2.)

The agreement required Maersk to provide direct assurances from Giltech that Maersk had the ability to convey the rights stated in the agreement. Maersk provided Medline with a letter from Giltech's legal counsel which outlined two agreements, the exclusive supply agreement and the trademark license, between Giltech and Maersk regarding the ARGLAES products. First, under the exclusive supply agreement, Giltech "agreed to supply only to [Maersk] ARGLAES calcium phosphate glass and silver ("the Products") for use in wound management" and gave Maersk the authority to grant sub-licenses. (Pl.'s Compl. Ex. 2 at 1.) Second, under the trademark license, Giltech authorized Maersk "to grant sub-licenses in respect of the trademark ARGLAES." (Pl.'s Compl. Ex. 2 at 1.) Both agreements expire on December 31, 2013. Giltech further stated "[t]he rights granted to [Maersk] by Giltech in respect of Giltech's rights in the trademark ARGLAES and in respect of Giltech's patents and know-how relative to the Products in the Field are granted on a world-wide basis." (Pl.'s Compl. Ex. 2 at 2.)

Problems arose when Medline learned that Giltech had contracted with another company, Tyco Healthcare Co. ("Tyco"), to market products in the United States in competition with Medline's ARGLAES products.[2] On February 13, 2002, Medline filed a six-count complaint against Maersk, Giltech, and Tyco in the Circuit Court of Cook County. On April 18, 2002, the

---

[2]Medline's complaint was filed against the "Doe" corporation. In the response brief Medline identified the "Doe" corporation as Tyco.

defendants removed the action to this court on the basis of diversity jurisdiction. Thus, the court has subject matter jurisdiction under 28 U.S.C. § 1332(a). Count I seeks a declaratory judgment that the agreement is valid and enforceable. Count II is a breach of contract claim against Maersk. Count III is a fraudulent inducement claim against Maersk. Count IV is a fraudulent misrepresentation claim against Giltech. Count V is a tortious interference with contract claim against Giltech. Count VI is a tortious interference with prospective business advantage claim against Maersk, Giltech, and Tyco. Maersk now moves to dismiss Counts II, III, and VI of Medline's complaint.

## II. DISCUSSION

### A.   Standard for Deciding a Rule 12(b)(6) Motion to Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff. *Hickey v. O'Bannon*, 287 F.3d 656, 657 (7th Cir. 2002). However, the court need not accept as true "conclusory statements of law or unsupported conclusions of fact." *McLeod v. Arrow Marine Transp.*, 258 F.3d 608, 614 (7th Cir. 2001). The purpose of a motion to dismiss is not to decide the merits of the challenged claims but to test their sufficiency under the law. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In deciding a motion to dismiss, the court reads a complaint liberally, dismissing the complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that entitles him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

4

The court is restricted in the consideration of a 12(b)(6) motion to the pleadings, which generally include the complaint, any exhibits attached thereto, and supporting briefs. *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). "A copy of any written instrument which is an exhibit to a pleading is part thereof for all purposes." FED. R. CIV. P. 10(c). The Seventh Circuit has interpreted "written instrument" as including contracts and correspondence between parties. *N. Ind. Gun & Outdoor Shows v. City of South Bend*, 163 F.3d 449, 453 (7th Cir. 1998). It is appropriate, therefore, for the court to consider the copy of the agreement that Medline attached to its complaint as Exhibit 1 and the letter from Giltech attached as Exhibit 2.[3]

In support of the motion to dismiss, Maersk argues that Counts II, III, and VI are improperly and prematurely stated claims for breach of the agreement and are Medline's effort to avoid the Choice-of-Law Clause and limitation of liability provision. First, as a threshold matter, the court must conduct a choice-of-law analysis in order to determine the substantive law that applies to each claim. Second, the court will evaluate the breach of contract claim. Third, the court will review the fraudulent inducement claim. Fourth, the court will consider the tortious interference with prospective economic advantage claim.

**B.** **Choice of Law**

Before evaluating the merits of Maersk's motion, the court must determine what substantive law applies. A federal court exercising diversity jurisdiction must apply the choice-

---

[3]The court will not consider Exhibit A of Medline's response in ruling on the motion to dismiss. *See Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000) (holding district court erred in relying on matters outside the complaint in ruling on motion to dismiss).

of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Midwest Grain Prods. of Ill., Inc. v. Productization, Inc. & CMI Corp.*, 228 F.3d 784, 787 (7th Cir. 2000). Thus, the court, sitting in Illinois, will apply Illinois choice-of-law rules. The court will conduct a choice-of-law analysis for each of Medline's claims, in turn.

### 1.   **Breach of Contract**

Count II of Medline's complaint is a breach of contract claim. As already noted, *supra* Sect. I, the agreement between Medline and Maersk contained a choice-of-law clause. The Choice-of-Law Clause states: "This agreement shall be subject to English Law and proceedings may be brought against either party in the Courts of England or the United States of America at the choice of the plaintiff. Both parties agree not to assert any defense to jurisdiction." (Pl.'s Compl. Ex. 1 at 20.)

Under Illinois law, a court will apply a contract's choice-of-law clause to disputes that arise from that contract, so long as the contract is valid. *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996); *see also Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002) ("Generally, choice of law provisions will be honored."). The parties do not contest the validity of the agreement and they agree that the Choice-of-Law Clause governs Count II.[4] Therefore, the court will apply English law to Medline's breach of contract claim.[5]

---

[4]Despite Maersk's reference to Illinois law in its discussion of the implied duty of good faith, Maersk expressly agrees that English law applies to Count II. (Def.'s Mem. at 5.)

[5]Consistent with Federal Rule of Civil Procedure 44.1, the parties have submitted appendices of English case law. The Seventh Circuit has emphasized "both trial and appellate (continued...)

## 2. Counts III and VI

The parties disagree, however, as to whether the Choice-of-Law Clause governs Counts III and VI. Count III alleges fraudulent inducement, and Count VI alleges tortious interference with prospective economic advantage. Maersk argues that these claims arise from the agreement and are governed by English law under the Choice-of-Law Clause. Medline responds that these are independent tort claims and, therefore, not subject to the Choice-of-Law Clause.

In applying a choice-of-law provision, courts first examine the breadth and language of the choice-of-law provision to determine whether the parties intended the choice-of-law provision to govern all claims between them. *Precision Screen Machs. Inc. v. Elexon, Inc.*, No. 95 C 1730, 1996 WL 495564, at *2 (N.D. Ill. Aug. 28, 1996).

> One can, it is true, find cases that say that contractual choice of law provisions govern only contractual disputes and not torts. But what the cases actually hold is that such a provision will not be construed to govern tort as well as contract disputes unless it is clear that this is what the parties intended. When it is clear the provision is enforced.

*Kuehn v. Children's Hosp., Los Angeles*, 119 F.3d 1296, 1302 (7th Cir. 1997) (citations omitted). In determining whether the parties intended the provision to govern tort as well as contract claims, courts look to whether the language of the provision encompasses all rights and liabilities arising out of the transaction or solely the construction of the contract. *Chicago Printing Co. v. Heidelberg USA, Inc.*, No. 01 C 3521, 2001 WL 1134862, at *3 (N.D. Ill. Sept. 25, 2001).

---

[5](...continued)
courts are urged to research and analyze foreign law independently." *Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1193 (7th Cir. 1985). The need for such independent research is due in part to inadequate research and partisan presentation of foreign law by counsel. *Id.* The court's independent research and analysis of foreign law were necessary in the instant case.

However, tort claims that are dependent upon the contract are subject to a contract's choice-of-law clause regardless of the breadth of the clause. *Precision Screen Machs. Inc.*, 1996 WL 495564, at *3. In conducting this analysis, courts examine whether the action alleges a wrong based upon interpretation and construction of the contract, or whether the claim alleges elements constituting an independent tort. *Am. Builders & Contractors Supply Co. v. Home Ins. Co.*, No. 96 C 5041, 1997 WL 43017, at *1 (N.D. Ill. Jan. 28, 1997). If a court determines that the choice-of-law provision does not apply, a federal court must consult the choice-of-law rules of the state in which it sits to determine which jurisdiction's substantive law applies. *Chicago Printing Co.*, 2001 WL 1134862, at *4 (citing *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995)).

First, the court must examine the breadth and language of the Choice-of-Law Clause to determine whether the parties intended the Choice-of-Law Clause to govern all claims between them. Second, the court will determine whether the claims are dependent upon the agreement and therefore subject to the Choice-of-Law Clause. Third, in the event the Choice-of-Law Clause is not applicable to the claims, the court will follow Illinois law in determining which jurisdiction's substantive law applies.

The Choice-of-Law Clause provides "[t]his agreement shall be subject to English Law." (Pl.'s Compl. Ex. 1 at 20.) This is in contrast to more broadly stated provisions encompassing all claims "arising out of" the contractual agreement. *See, e.g., Omron Healthcare, Inc. v. MacLaren Exp. Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994) (holding "arising out of" language in forum selection clause included all disputes resolution of which depended on construction of the

agreement). The parties included such broad language in the previous clause of the agreement, "In the event of any controversy or claim arising out of or relating to any provision of this Agreement or the breach thereof, the parties shall try to settle the problem amicably between themselves." (Pl.'s Compl. Ex. 1 at 20.) However, the parties used restrictive language in the Choice-of-Law Clause. Although the parties easily could have done so, they did not draft a more expansive choice-of-law provision to encompass tortious conduct or other actions relating to their relationship. *Chicago Printing Co.*, 2001 WL 1134862, at *3. Thus, the limited language of the Choice-of-Law Clause does not reflect a clear intent that the parties' tort claims be governed by English law. The court will examine Medline's fraudulent inducement and tortious interference claims in turn to determine whether the claims are dependent upon the agreement such that they are governed by the Choice-of-Law Clause.

### a.     Fraudulent Inducement

First, for choice of law purposes, a fraudulent inducement claim is considered to be dependent upon the contract and, therefore, subject to the choice-of-law clause, where the allegedly fraudulent statements were made in the contract. *See Midway Home Entm't v. Atwood Richards Inc.*, No. 98 C 2128, 1998 WL 774123, at *3 (N.D. Ill. Oct. 29, 1998). In this case, Medline alleges the misrepresentation occurred when "Maersk itself represented *in the ... Agreement* that it had an 'exclusive Supply Agreement' with Giltech ... and that it had the right to grant exclusive sub-licenses to Medline." (Pl.'s Resp. at 9.) (emphasis added). Because Maersk's allegedly fraudulent statements were made in the agreement, Medline's claim for

fraudulent inducement is dependent upon the agreement. Therefore, the claim is governed by the Choice-of-Law Clause, and consequently, the court will apply English law to Count III.

### b.    Tortious Interference

Second, courts have held tortious interference with prospective economic advantage is a tort that is independent of choice-of-law clauses and subject to the forum's choice-of-law rules. *See Labor Ready, Inc., v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 409 (N.D. Ill. 2001) (applying choice-of-law provision to contract claims and engaging in choice-of-law analysis for tortious interference claims). Therefore, the Choice-of-Law Clause does not apply to Medline's tortious interference claim. Consequently, the court must determine whether the substantive law of Illinois or England governs Count VI.

Illinois applies the "most significant relationship" test to determine which jurisdiction's substantive law governs tort claims such as tortious interference. *Id.* Under this test, the court considers: (1) the place of injury; (2) the place of the tortious conduct; (3) the domicile of the parties; and (4) the place where the relationship between the parties is centered. *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 504 (7th Cir. 1998) (citing *Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996)). "'[T]he law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties.'" *Id.* (quoting *Esser*, 661 N.E.2d at 1141).

In the instant case, the alleged place of injury is Illinois because Medline's principal place of business and state of incorporation is Illinois and the economic impact of the tortious interference will be felt in Illinois. *See Garot Anderson Agencies, Inc. v. Blue Cross & Blue*

*Shield United of Wis.*, No. 88 C 20265, 1993 WL 78756, at *18 (N.D. Ill. Feb. 26, 1993) ("[W]here the injury is loss of customers or trade, the injury occurs at the place of loss, ... but it is most keenly felt at the principal place of business."). The parties have not provided sufficient information for the court to assess the other factors of the most significant relationship test. However, the most important factor, the place of injury, weighs in favor of Illinois. *See St. Charles Riverfront Station, Inc. v. Empress Casino Joliet Corp.*, 5 F. Supp. 2d 592, 594 (N.D. Ill. 1998) (applying the law of the place of injury despite other factors that weighed in favor of another jurisdiction). Therefore, because the place of injury is Illinois, the court will apply Illinois law to Medline's tortious interference claim. The court will now turn to the merits of Maersk's motion to dismiss.

## C.     Count II: Breach of Contract

In Count II Medline alleges that Maersk breached the agreement and its implied duty of good faith. As previously noted, *supra* Sect. II.B.1, the parties agree that English law applies to Count II. In support of its motion to dismiss, Maersk argues: (1) there is no implied duty of good faith and fair dealing under English law and (2) Medline failed to plead any express breach of any term of the agreement and is attempting to state a claim for conditional breach of contract. Medline argues in response: (1) Maersk owed a duty of good faith and fair dealing in performance of the agreement and that Maersk violated that duty when it reduced the extent of its own rights as to Giltech without notice to Medline and (2) Maersk "breach[ed] its representations of exclusivity," which are expressed in Article 3. (Pl.'s Resp. at 8.) Additionally, the parties disagree as to the interpretation of Article 3.

First, the court will examine whether English law recognizes an implied duty of good faith. Second, the court will examine whether Medline sufficiently stated a claim for breach of the agreement.

### 1.    <u>Implied Duty of Good Faith</u>

It is well established that English case law does not recognize any general implied duty of good faith and fair dealing. *Baird Textile Holdings Ltd. v. Marks & Spencer*, [2002] 1 All E.R. 737 (C.A.) (noting "English law's general refusal to recognise any duty [of good faith] as an implied contractual term."); *see also Interfoto Picture Library Ltd. v. Stiletto Visual Programmes Ltd.*, [1989] Q.B. 433, 439 ("English law has, characteristically, committed itself to no such overriding principle [of good faith]."); *Laceys Footwear (Wholesale) Ltd. v. Bowler Int'l Freight Ltd.*, [1997] 2 Lloyd's Rep. 369, 384 (C.A.) (citing *Interfoto* for the proposition that English law does not require that in "making and carrying out contracts parties should act in good faith."). Where, as in the instant case, the parties are sophisticated businesses operating in a commercial context, the law of England will not step in to alter the terms of the bargained for agreement. *See Union Eagle Ltd. v. Golden Achievement Ltd.*, [1997] All E.R. 215, 218 (P.C.) (discussing the business considerations behind English courts' rejection of acting in equity to restrain the enforcement of contracts and stating "if something happens for which the contract has made express provision, the parties should know with certainty that the terms of the contract will be enforced."); CHITTY ON CONTRACTS § 1-019, at 13 ( 28th ed. 1999) ("[T]he modern view is that, in keeping with the doctrines of freedom of contract and the binding force of contracts, in English contract law good faith is in principle irrelevant.").

12

There is no claim under English law for breach of an implied duty of good faith and fair dealing. Therefore, the court grants Maersk's motion to dismiss as to Count II insofar as Medline bases that claim upon an implied duty of good faith under English law.

### 2.   Breach of Representations of Exclusivity in Article 3

Medline argues that regardless of whether English law recognizes a duty of good faith, it stated a claim for breach of contract because plaintiff alleges defendant breached the representation of exclusivity that it made in Article 3. Maersk contends: (1) this is a conditional or anticipatory claim rather than a claim for a present breach of contract and (2) Article 3 was not breached because it addressed only the supply needed for Maersk to manufacture the product, not the access of others.[6] The court will address each of Maersk's arguments in turn.

### a.   Breach of the Agreement

For Medline to frame its claim as Maersk "will be in breach" is not fatal under English law. *See J. Lowenstein & Co. Ltd. v. Durable Wharfage Co. Ltd.*, [1973] 1 Lloyd's Rep. 221 (M.C.L.C.) (discussing the following statement of a claim: "if the plaintiff's said contentions are established it follows that the third party ... will be in breach of the said contract."). Medline may be able to prove an express breach of the terms of the agreement. Allowing Medline to pursue the declaratory judgment in Count I will enable the court to determine whether the agreement has been breached. *Dresser Indus., Inc. v. Pyrrhus Ag*, 936 F.2d 921, 933 (7th Cir.

---

[6]In its complaint, Medline alleges: "if the court does not grant the relief requested in Count I ... Maersk *will be in breach* of its representations of exclusivity ... under the ... Agreement." (Pl.'s Compl. at 13.) (emphasis added). However, in its response brief Medline incorrectly states: "[t]o the contrary, Medline's complaint specifically alleges that Maersk '*breach[ed]* its representations of exclusivity.'" (Pl.'s Resp. at 8.) (emphasis added).

1991) (finding breach of contract claims sufficient to survive a 12(b)(6) motion because party may eventually be entitled to relief and permitting party to seek declaratory judgment to determine viability of breach of contract claims). The court concludes that Medline states a claim for breach of the representation of exclusivity in Article 3 of the agreement.

###    b.    Article 3 in the Context of the Agreement

The parties dispute the meaning of the terms of Article 3 of the agreement in the context of other provisions of the agreement. Maersk argues Article 3 addressed the supply needed for Maersk to manufacture the product, not the access of others to the raw materials, and that the parties anticipated competition. Medline argues in response that the exclusive supply agreement between Maersk and Giltech referred to in Article 3, gave Maersk the exclusive supply of the raw materials necessary to manufacture the ARGLAES product.

Article 3 of the agreement states: "[Maersk] represents that it holds an exclusive Supply Agreement for the supply to [Maersk] of the raw material necessary for the manufacturer [sic] by [Maersk] of [ARGLAES] Products and that said Supply Agreement is for the total duration of this Agreement and shall be maintained in full validity." (Pl.'s Compl. Ex. 1 at 2.) Due to the Choice-of-Law Clause, discussed *supra* Sect. II.B.1, the court will apply English law to the construction of the agreement, which is an issue of law. *Reliance Indus. Ltd. v. Enron Oil & Gas India Ltd.*, [2002] 1 Lloyd's Rep. 645 (Q.B.). Under English law,

> the object of contractual construction is to ascertain the intention of the parties, based on the meaning which their agreement would convey to a reasonable person having all the background knowledge which would reasonably be available to the parties in the situation in which they were at the time of the contract.

*Household Global Funding Inc. v. British Gas Trading Ltd.,* No. HC 0100604, 2001 WL 676757 (Ch. June 29, 2001). A review of the context of Article 3 demonstrates that Medline's interpretation of Article 3 is permissible, for reasons stated below.

Article 4 recognizes that the parties anticipated competing products and also limits Medline's ability to sell such products. However, Medline's claim deals only with the Giltech product and supply. Maersk represented in the agreement it had an "exclusive supply agreement" with Giltech that would be "maintained in full validity." (Pl.'s Compl. Ex. 1 at 2.) Therefore, Medline's reading of Article 3 is consistent with Article 4.

Article 6 gives each party a right of first refusal in the event that either party manufactured or invented new wound care products. Article 6 belies Maersk's argument that the parties contemplated an open market of competing products as it provides assurances of exclusivity by offering these rights of first refusal. Therefore, Medline's reading of Article 3 is consistent with Article 6. Consequently, the court concludes neither Article 4 nor 6 precludes Medline's claim that Maersk breached the terms of Article 3. Therefore, the court denies Maersk's motion to dismiss Count II to the extent Medline states a claim for breach of the agreement.

In sum, the court grants Maersk's motion to dismiss Count II to the extent it relies upon an implied duty of good faith. The court denies Maersk's motion to dismiss Count II to the extent Medline states a claim that Maersk breached the terms of the agreement.

**D.    Count III: Fraudulent Inducement**

In Count III Medline alleges that Maersk made fraudulent statements that induced Medline to enter the agreement. As already discussed, *supra* Sect. II.B.2.a, this claim is governed by English law. Maersk argues: (1) Medline should be precluded from pleading promissory fraud based upon contract promises; (2) Medline's claim is barred by the economic loss doctrine; and (3) Medline's claim is precluded by the limitation of liability provision.[7] The court will review each of Maersk's arguments in turn.

**1.    Promissory Fraud based on Contract Promises**

Maersk alleges Medline fails to state a claim for fraudulent inducement because Medline does not allege an actionable misrepresentation of material fact. Specifically, Maersk argues Medline should be precluded from basing fraud on contractual statements and alleging a false promise of future conduct to continue the supply contract with Giltech for the duration of the agreement.

---

[7]In addition, Maersk argues the alleged misrepresentations came from Giltech and that Medline is not allowed to impute those statements to Maersk due to the integration clause. Contrary to Maersk's interpretation, Medline is not basing its fraudulent inducement claim upon the statements made by Giltech, but Maersk's own representations made in Article 3 of the agreement. Thus, the court need not address Maersk's arguments regarding the integration clause and Giltech's letter.

Maersk also argues that if Medline is allowed to pursue its promissory fraud claim Medline's pleadings are insufficient because Medline failed to allege a scheme or device citing Federal Rule of Civil Procedure 9(b). However, Rule 9(b) includes no such requirement. Also, Maersk raises Illinois law despite its argument English law should govern the claim. However, the court determined *supra* Sect. II.B.2.a that English law applies to this claim and therefore the court need not address this argument.

The elements of a claim of fraudulent inducement under English law are: (1) misrepresentation of a material fact, (2) made with knowledge that it is false and with the intent that the other party act upon it, (3) which is reasonably relied upon by the other party, (4) and as a result of which the party suffers injury. *Morgan Guar. Trust Co. v. Republic of Palau*, 693 F. Supp. 1479, 1498 (S.D.N.Y. 1988) (citing *Bradford Third Equitable Benefit Bldg. Soc'y v. Borders*, [1941] 2 All E.R. 205). Although a fraud claim cannot be premised on the fraudulent non-performance of the contract itself, a party can allege fraud in the making of the contract. *Cont'l Grain Co. v. Pullman Standard, Inc.*, 690 F. Supp. 628, 634 (N.D. Ill. 1988).

Medline is not alleging a fraudulent non-performance, but that a fraudulent statement was made to induce Medline to enter the agreement. Medline alleges the misrepresentation occurred during the negotiation process. (Pl.'s Resp. at 10.) The fact that the misrepresentation was also included in the agreement is not fatal to the claim.

Additionally, Maersk incorrectly characterizes the false statement as a promise regarding future conduct. In fact, Medline alleges the misrepresentation was made when Maersk stated it had exclusive rights to the supply of materials and the product. Medline is not merely arguing Maersk currently does not have or failed to maintain these rights, but that Maersk never had these exclusive rights. This complies with the requirement that a fraudulent statement state a past or present fact. *Enter. Warehousing Solutions, Inc. v. Capital One Servs., Inc.*, No. 01 C 7725, 2002 WL 406976, at *6 (N.D. Ill. Mar. 15, 2002). Therefore, the court concludes that Medline has sufficiently stated a misrepresentation of material fact.

17

## 2. **Economic Loss Doctrine**

Maersk argues that the economic loss doctrine bars Medline from bringing its fraudulent inducement claim. Generally, the economic loss doctrine "'denies remedy in tort to a party whose complaint is rooted in disappointed contractual or commercial expectations.'" *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 615 (7th Cir. 2001) (quoting *Collins v. Reynard*, 607 N.E.2d 1185, 1188 (Miller, J., concurring)). As already discussed, *supra* Sect. II.B.2.a, English law governs this claim. English law discusses this issue in terms of concurrent or alternative liability, which allows parties to seek recovery in contract or in tort so long as the tort is based upon an independent duty.

The proposition of concurrent or alternative liability has been accepted in English law. *Standard Bank of London Ltd. v. Bank of Tokyo Ltd.*, [1995] 2 Lloyd's Rep. 169, 185 (Q.B.) ("Liability in contract does not necessarily negate liability in tort.").

> "A concurrent or alternative liability in tort will not be admitted if its effect would be to permit the plaintiff to circumvent or escape a contractual exclusion or limitation of liability for the act or omission that would constitute the tort. Subject to this qualification, where concurrent liability in tort and contract exists the plaintiff has the right to assert the cause of action that appears to be the most advantageous to him in respect of any particular legal consequence."

*Id.* at 186 (quoting Mr. Justice Le Dain, in delivering the judgment of the Supreme Court of Canada in *Central Trust Co. v. Rafuse*, (1986) 31 D.L.R. (4th) 481, 521-22). Thus, if a plaintiff alleges a breach of a duty that is separate from the contract, it can proceed in tort. A party will only be barred from bringing a claim in tort if the alleged duty arises out of the contract. *Raflatac Ltd. v. Eade*, [1999] 1 Lloyd's Rep. 506, 508 (Q.B.) (quoting Mr. Justice Le Dain, *Central Trust Co.*, 31 D.L.R. at 521-22) ("'A claim cannot be said to be in tort if it depends for

the nature and scope of the asserted duty of care on the manner in which an obligation or duty has been expressly and specifically defined by a contract.'"). English courts explicitly have recognized that a "claimant in a fraud case can recover compensation for losses suffered by reason of entering into the contract which the fraudulent misrepresentation had induced." *Aneco Reinsurance Underwriting Ltd. v. Johnson & Higgins Ltd.*, [2002] 1 Lloyd's Rep. 157, 160 (H.L.).

In this case, the fraudulent inducement claim is not based upon duties arising from the contract, as in a negligence case. Instead, the claim alleges an independent intentional tort. Although the allegedly fraudulent statements were made in the agreement, the duty that was allegedly violated did not arise from the agreement, but from tort law. *W. Indus. Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1206 (7th Cir. 1984) ("the right to be free from fraudulent inducements to contract, does not arise out of a contract."). Therefore, the court concludes that the economic loss doctrine does not preclude Medline's fraudulent inducement claim.

### 3. Limitation of Liability Provision

As discussed *supra* Sect. I, the agreement contains a limitation of liability provision which states: "either party to this Agreement is under no circumstances liable for any indirect or consequential loss of the other party." (Pl.'s Compl. Ex. 1 at 6.) Maersk argues Medline is seeking to circumvent this clause by bringing its fraudulent inducement claim. In response, Medline argues this provision is limited to the context of "Product & Package Specifications and Defects."

19

As discussed, *supra* Sect. II.B.2.a, English law applies to the fraudulent inducement claim. The construction or interpretation of the contract is an issue of law. *Reliance Indus. Ltd.*, 1 Lloyd's Rep. 645. Under English law, the goal of contract construction is to determine the intention of the parties, "based on the meaning which their agreement would convey to a reasonable person having all the background knowledge which would reasonably be available to the parties in the situation in which they were at the time of the contract." *Household Global Funding Inc. v. British Gas Trading Ltd.,* No. HC 0100604, 2001 WL 676757 (Ch. June 29, 2001). In construing the words of the contract, "[t]he words must be set in the landscape of the instrument as a whole." *Charter Reinsurance Co. Ltd. v. Fagan*, [1996] 3 All E.R. 46, 51 (H.L.).

A court may dismiss a claim if a contractual limitation of remedies provision prohibits the claimant from recovering the damages sought. *Factory Mut. Ins. Co. v. Bobst Group Inc.,* No. 02 C 383, 2002 WL 1263991, at *3 (N.D. Ill. June 5, 2002). Under English law, the parties may contract to limit their liabilities; however, general exculpatory clauses will not bar recovery for damage resulting from intentional, negligent, or reckless misconduct unless it is clear that the parties intended that result. *See Gillespie Bros. & Co. Ltd. v. Roy Bowles Transp. Ltd.,* [1973] 1 Lloyd's Rep. 10, 19 (C.A.) ("liability for negligence can be effectively excluded by contract ... provided that the language or the circumstances are such to make it perfectly clear that this was the intention of the parties."). A clear expression of the parties' intent, either expressly or by implication, is required as "'it is inherently improbable that one party to the contract should intend to absolve the other party from the consequences of the latter's own negligence'" or misconduct. *Lamport & Holt Lines Ltd. v. Coubro & Scrutton*, [1982] Lloyd's Rep. 42 (C.A.).

20

Further, English law generally recognizes "'no exclusion clause can protect a party from the consequences of his own fraud.'" *HIH Cas. & Gen. Ins. Ltd. v. Chase Manhattan Bank*, [2001] Lloyd's Rep. 483 (C.A.) (quoting 9 HABSBURG'S LAWS OF ENGLAND par. 800 (4th ed. 1998)).

In this case, the words do not demonstrate whether the parties clearly intended that the limitation of liability provision would apply to tort remedies. Further, the context of the provision, Article 5, entitled "Product & Package Specification and Defects," is relevant in interpreting the scope of the limitation of liability. The previous two clauses deal with indemnity for losses caused by negligent acts or omissions by Maersk or by the products, but make no reference to intentional tort claims. Also, and most importantly, the last clause in Article 5 defines its limited scope, "Medline and [Maersk] acknowledge that their rights *under this article 5 relating to the quality of the Products or their performance capabilities* are the totality of their rights and that any statutory or other implied rights will not apply." (Pl.'s Compl. Ex. 1 at 7.) (emphasis added). In light of the context, the limitation of liability provision addresses the parties' remedies for claims relating to the quality and performance of the products, not all claims between the parties. Therefore, the court concludes the limitation of liability provision does not prevent Medline from recovering for fraudulent inducement.

Medline has sufficiently stated a claim for fraudulent inducement. Neither the economic loss doctrine nor the limitation of liability provision hinder Medline from recovering for fraudulent inducement. Therefore, the court denies Maersk's motion to dismiss Count III.

**E.    Count VI:  Tortious Interference**

In Count VI Medline alleges that Maersk's actions interfered with Medline's prospective business.  As discussed previously, *supra* Sect. II.B.2.b, Illinois law governs the tortious interference claim.  Maersk argues Count VI should be dismissed because:  (1) a breach of the agreement by Maersk is an insufficient basis for tortious interference, (2) Medline failed to allege any act by Maersk directed toward any third party, (3) the claim is precluded by the economic loss doctrine and the limitation of liability provision.

**1.    Tortious Interference based upon Breach of the Agreement**

To prevail on a claim of tortious interference with prospective economic advantage under Illinois law, a plaintiff must prove:  (1) a reasonable expectation of entering into a valid business relationship;  (2) the defendant's knowledge of the plaintiff's expectancy;  (3) the defendant intentionally and unjustifiedly interfered to prevent plaintiff's expectancy from being fulfilled; and (4) damages suffered by the plaintiff from such interference.  *Fredrick*, 144 F.3d at 502. Maersk argues the third element was not met because a breach of the agreement cannot constitute an interfering action.

Contrary to Maersk's argument, the basis of the allegation for tortious interference is not the breach of the agreement.  Instead, Medline alleges "Maersk ... purposefully interfered with Medline's legitimate expectancy by injecting a new, unanticipated and illegal competitor into the ARGLAES market which will prevent Medline from ripening valid business relationships." (Pl.'s Compl. at 16-17.)  Also, Medline states in its response:  "Maersk knew, when it tortiously attempted to abrogate those rights by allowing Giltech to supply Medline's competitor Tyco, that

22

its actions would interfere with the contracts and business relationships between Medline and its customers." (Pl.'s Resp. at 11-12.) Thus, the alleged interfering action may constitute a breach of the agreement, but also goes beyond the agreement and includes any actions taken by Maersk in "injecting" Tyco as a competitor into the market. The court concludes that Medline's allegations are sufficient to constitute an interfering action for purposes of 12(b)(6).

### 2. Act Directed Toward a Third Party

The Seventh Circuit has made clear that to survive a 12(b)(6) motion to dismiss a claim for tortious interference with prospective economic advantage, a plaintiff is not required to allege a specific third party or class of third parties with whom he claims to have had a valid business expectancy. *Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998). The plaintiff need allege only that an expectancy existed and that the defendant purposefully interfered with it. *Id.* Maersk cites several Illinois cases in support of its argument that Medline has failed to sufficiently allege actions directed toward a third party. However, the pleading requirements to survive a motion to dismiss under Illinois law are more stringent than those of the Federal Rules. *Barrett v. Poag & McEwen Lifestyle Ctrs.-Deer Park Town Ctr., LLC*, No. 98 C 7783, 1999 WL 691850, at *9-10 (N.D. Ill. Aug. 26, 1999) (discussing the higher threshold to survive a motion to dismiss for a claim of tortious interference under the Illinois fact pleading standard compared to the notice pleading standard of the Federal Rules). Therefore, the court is unpersuaded by Maersk's argument.

Here, Medline alleges that it had a "reasonable expectation of entering into valid business relationships with thousands of customers for the sale of the ARGLAES product," Maersk was

23

aware of this expectation and purposefully interfered, resulting in damages. The court finds that Medline's allegations satisfy the federal pleading requirements. Therefore, the court concludes Medline has sufficiently stated a claim for tortious interference with prospective economic advantage.

### 3.    Economic Loss Doctrine and Limitation of Liability Provision

Maersk argues the tortious interference claim is precluded by the economic loss doctrine and the limitation of liability provision. For reasons already explained, *supra* Sect. II.B.2.b, Illinois law governs the tortious interference claim. As discussed, *supra* Sect. II.D.2, the economic loss doctrine "'denies a remedy in tort to a party whose complaint is rooted in disappointed contractual or commercial expectations.'" *Mut. Serv. Cas. Ins. Co.*, 265 F.3d at 615 (quoting *Collins*, 607 N.E.2d at 1188 (Miller, J., concurring)). Under Illinois law, this principle is known as the *Moorman* doctrine, under which plaintiffs are prevented from recovering solely economic damages under the tort theories of negligence, strict liability, or negligent misrepresentation. *Outboard Marine Corp. v. Babcock Indus.*, 1994 WL 468596, at *10 (N.D. Ill. Aug. 26, 1994) (citing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982)).

However, Illinois courts have held that the *Moorman* doctrine and its progeny did not abolish causes of action for intentional interference with contract and prospective advantage. *2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frasier, Ltd.*, 555 N.E.2d 346, 352 (Ill. 1990) (citing Illinois cases allowing recovery of economic losses for intentional interference with contract and prospective economic advantage). Additionally, as already discussed, *supra*

Sect. II.D.3, the limitation of liability provision does not preclude Medline from recovering for intentional torts.

In sum, the court finds Medline has stated a claim for tortious interference with prospective economic advantage. The tortious act is not the breach of the agreement and Medline need not identify the third parties at this stage. Neither the economic loss doctrine nor the limitation of liability provision precludes Medline from asserting the claim. Therefore, the court denies Maersk's motion to dismiss Medline's tortious interference claim.

## III. CONCLUSION

For the foregoing reasons, the court grants defendant's motion to dismiss Count II insofar as it relies upon an implied duty of good faith. The court denies defendant's motion to dismiss Count II to the extent it states a claim for breach of the terms of the agreement. The court denies defendant's motion to dismiss Counts III and VI of plaintiff's complaint.

Date: NOV 14 2002

James H. Alesia
United States District Judge